Adolph Francis WHITEPLUME,
Appellant (Defendant),

v.

STATE of Wyoming, Appellee (Plaintiff).

No. 91–241.

Supreme Court of Wyoming.

Nov. 10, 1992.

Leonard Munker, Public Defender, Deborah Cornia, Appellate Counsel, Cheyenne, for appellant.

Joseph B. Meyer, Atty. Gen., Sylvia L. Hackl, Deputy Atty. Gen., Barbara L. Boyer, Sr. Asst. Atty. Gen., Donna D. Hoffdahl, Student Intern, Cheyenne, for appellee.

Before MACY, C.J., and THOMAS, CARDINE, URBIGKIT * and GOLDEN, JJ.

GOLDEN, Justice.

Appellant, Adolph Francis Whiteplume, appeals his conviction of first degree sexual assault.[1] He raises issues concerning his right to speedy trial, the admissibility of testimony allegedly vouching for the alleged victim's credibility, the admissibility of testimony allegedly expressing an opinion of appellant's guilt, and the admissibility of hearsay testimony.

We reverse and remand for retrial.

Appellant states the issues in this way:

ISSUE I

Did the trial court err when it failed to dismiss for lack of speedy trial?

ISSUE II

Was the admission of testimony of two of the State's witnesses vouching for the credibility of the alleged victim and stating that Appellant was guilty of the crime charged error per se and plain error, denying Appellant his right to a fair trial by jury?

ISSUE III

Were hearsay statements improperly introduced in violation of Appellant's right to confrontation?

## FACTS

The state's prosecution of appellant arose from activities involving appellant and the alleged victim in the late night hours of October 12, and the early morning hours of October 13, 1990, in appellant's mobile home in Riverton, Wyoming. In drawing a picture of the facts relevant to the issues presented in this appeal, we need not describe events transpiring earlier in the evening of October 12 before the victim and appellant are placed in appellant's mobile home. About those earlier events, it suffices to say discrepancies exist when one compares the victim's testimony with appellant's testimony. Agreement between them exists, however, that the victim was intoxicated when she arrived at appellant's mobile home and there was sexual contact between them that night. With regard to that sexual contact, the victim's testimony describes a sexual assault. Appellant's testimony, in contrast, describes consensual behavior.

According to the victim, soon after she and appellant were alone in his mobile home, he brutally attacked her, grabbed her by her hair, dragged her into a small bedroom, pulled off her clothing, and tried, against her will, to have sexual intercourse. Unable to accomplish that act, appellant allegedly tried to force the victim to perform several oral sex acts on him, which she resisted. Against the victim's will, appellant allegedly penetrated the victim's vagina with a dildo. Fighting back, she was able to briefly incapacitate appellant and make her escape wearing only a shirt she grabbed as she ran from the mobile home.

The victim ran to a nearby house and was let in by the occupants. They called the sheriff's department. Two sheriff's deputies quickly responded by coming to the house where the victim was and interviewing her. After interviewing the victim, sheriff's deputy James Nethercott drove the victim to the hospital. As they drove past appellant's mobile home, the victim pointed it out to the deputy, telling him that was where she was raped.

---

* Chief Justice at time of oral argument.

1. Wyo.Stat. § 6–2–302 (1988) states in pertinent part:

    (a) Any actor who inflicts sexual intrusion on a victim commits a sexual assault in the first degree if:

    (i) The actor causes submission of the victim through the actual application, reasonably calculated to cause submission of the victim, of physical force or forcible confinement.

At the hospital, in addition to being medically examined, the victim was interviewed by Jacque Taylor, director of the Office of Family Violence and Sexual Assault.

In the meantime, Deputy Nethercott drove to appellant's mobile home to speak with him. The deputy informed appellant of his constitutional rights; appellant agreed to talk to the deputy and consented to the deputy's search of his mobile home and a visual examination of his chest, arms, hands and back. During the search, the deputy observed a dildo. He located and seized the victim's clothing.

Leaving appellant's mobile home, Deputy Nethercott returned to the hospital and again interviewed the victim. During that interview, he learned that appellant had used a dildo on the victim. Later on October 13, the deputy obtained a search warrant, returned to appellant's mobile home, and seized the dildo.

In the evening hours of October 13, 1990, following appellant's physical examination at the hospital pursuant to a search warrant, the deputy arrested appellant and placed him in the county jail. On October 15, 1990, the state filed a criminal complaint in which it charged appellant with first degree sexual assault. At his initial appearance in county court, appellant was released on an unsecured $10,000 bond.

On November 2, 1990, appellant's preliminary hearing was held, at the conclusion of which he was bound over for trial in the district court. The district court arraigned appellant on December 19, 1990, at which he entered a not guilty plea; the district court set the trial for February 25, 1991, and continued appellant's bond.

Sixty-eight days elapsed from appellant's arrest until his arraignment. When the district court at arraignment set the trial for February 25, 1991, all knew that another sixty-eight days would pass before trial; thus, a total of 136 days would have elapsed between appellant's arrest and trial. At the arraignment, when this was known, neither appellant nor his lawyer complained or showed either orally or in writing how a sixteen-day delay beyond the 120–day period provided by Rule 204, Uniform Rules of the District Courts, might prejudice appellant's defense.

On January 29, the day before the pretrial conference was to be held, the prosecutor decided to charge appellant with kidnapping and a second count of first degree sexual assault growing out of the same activities that had supported the first charge of first degree sexual assault. On January 29, then, appellant was arrested on these two new charges.

On January 30, the prosecutor and appellant's lawyer met with the district court judge. The pretrial conference was vacated. The prosecutor informed those present of his intentions to pursue the two new felony charges in addition to the pending charge. The prosecutor stated that the three charges could be consolidated for trial purposes and no need existed to vacate the existing trial date of February 25. Appellant's lawyer urged a continuance of the trial date, stating that his investigator would need further time to investigate the case due to the additional charges. The district court judge then decided to vacate the February 25 trial date.

On February 8, the county court held a preliminary hearing on the additional charges; appellant was bound over on the additional sexual assault charge, but not the kidnapping charge. On March 6, the prosecutor filed an information against appellant with respect to the additional sexual assault charge.

On April 8, the district court arraigned appellant on that additional charge. The court continued his unsecured bond. On April 29, the district court's order was filed and approved as to form by both the prosecutor and appellant's lawyer. Among other things, it recited that appellant's trial was set for June 18, 1991, that all motions were to be filed by May 20, 1991, and that a pretrial conference was set for May 30, 1991.

Between April 29, and May 21, appellant did not show the district court either orally or in writing how a delay in the trial, now set to begin June 18, may prejudice his defense. On May 22, however, appellant

filed with the district court a motion to dismiss for failure to grant a speedy trial. Although appellant in the motion alleged that the prosecution's actions caused delay "to the prejudice of the [appellant]," appellant did not state what that prejudice was and he did not attach any affidavit to the motion.

On May 30, the district court held the pretrial conference and a hearing on several pending motions, including appellant's speedy trial motion. With respect to appellant's speedy trial motion, he produced his investigator, Randy Hanson, to testify in support of the motion. The district court reserved ruling on the motion; on June 6, the motion was denied.

The trial began on June 18. Twelve witnesses testified, including the victim, appellant, Deputy Sheriff Nethercott, and rape counselor Jacque Taylor. The alleged evidentiary errors raised in this appeal occurred during the testimony of Nethercott and Taylor, both state's witnesses. When we address those alleged errors later in this opinion, we shall state fully the factual context framing them.

On June 21, 1991, the jury found appellant guilty of one count of first degree sexual assault. Later, the district court sentenced him to serve a prison term of not less than seven years nor more than ten years with credit for eight days pre-sentence incarceration, to repay $464.55 to the state for costs of prosecution, and to pay $50 to the Crime Victim's Compensation Fund. Appellant timely lodged this appeal.

We shall first address the speedy trial issue, and then move on to the evidentiary issues, if necessary.

I

SPEEDY TRIAL

■ This court's speedy trial jurisprudence is an amalgam of the balancing test of *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101, 116 (1972) and the provisions of Rule 204 of the Uniform Rules for the District Courts of the State of Wyoming. *Osborne v. State*, 806 P.2d 272, 277 (Wyo.1991). Rule 204 "is advisory in nature and is a factor to be considered in the balancing test." *Id.* Under the balancing test, we consider and weigh "(1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of [his] right; and (4) the prejudice to the defendant." *Id.*

"[U]nder constitutional analysis, the speedy trial clock starts to run upon arrest or when the complaint is filed." *Harvey v. State*, 774 P.2d 87, 94 (Wyo.1989). The deputy sheriff arrested appellant on October 13, 1990, after his physical examination at the hospital. The authorities filed the criminal complaint against appellant on October 15. From the date of appellant's arrest on October 13, 1990, to the date of appellant's trial on June 18, 1991, 249 days elapsed.

In our case law, we have recognized that Rule 204 specifies certain time periods which we may subtract from the time span between arrest and trial when computing the length of delay. *Harvey*, 774 P.2d at 94; *Phillips v. State*, 774 P.2d 118, 121 (Wyo.1989). Thus, in pertinent part, Rule 204 specifies:

(c) The following periods shall be excluded in computing the time for trial:

\*　　\*　　\*　　\*　　\*　　\*

(3) Delay granted by the court pursuant to Section (d).

\*　　\*　　\*　　\*　　\*　　\*

(d) Continuances may be granted as follows:

\*　　\*　　\*　　\*　　\*　　\*

(2) On motion of \* \* \* the court if:
(i) The defendant expressly consents; or

\*　　\*　　\*　　\*　　\*　　\*

(iii) Required in the due administration of justice and the defendant will not be substantially prejudiced.

(e) Upon receiving notice of possible delay the defendant shall show in writing how the delay may prejudice his defense.

The trial judge set appellant's trial date for February 25, 1991. From the arrest date of October 13, 1990, to the February

25 trial date, 136 days would have elapsed. The trial court had established the February trial date at appellant's arraignment on December 19, 1990. That arraignment was held sixty-eight days after appellant's arrest. Appellant and his lawyer knew at the arraignment that the February trial date would be sixteen days beyond the 120–day provision of Rule 204. They chose, however, not to raise the issue. They chose not to try to show in writing, as Rule 204(e) provided, how the delay might prejudice appellant's defense. From these circumstances, we can only conclude that appellant perceived no prejudice to his defense and was satisfied with the February trial date.

On January 30, 1991, appellant and his lawyer knew the prosecutor was actively pursuing two additional felony charges, *viz.*, a second first degree sexual assault charge and a kidnapping charge, growing out of the same set of facts of which the prosecutor was aware on October 13, 1990. On January 30, 1991, the prosecutor did not ask for a continuance of the February 25 trial date; instead, the prosecutor expressly stated he opposed any continuance. The trial court, however, was considering a continuance for several reasons. One reason concerned some question about the testimony of the state's expert witness and the rape trauma syndrome. The other reason concerned the state's desire to consolidate the original first degree sexual assault charge with the additional first degree sexual assault charge and kidnapping charge. The trial court "notified the State of its intention to continue the trial date, and the State presented argument against moving the date of the trial." The prosecutor was obviously sensitive to a speedy trial issue. According to the trial court's order,

> [a]t that time, the Defense entered argument for continuing the trial, based upon the fact that they wished to have the investigator make further inquiries into this case in preparation for trial based upon the possible additional charges.

The February trial date was then continued.

The thrust of appellant's argument on his speedy trial issue is that the delay between the vacated February 25 trial date and the June 18 trial date, a period of 113 days, was caused by the prosecutor's filing additional charges and occurred without appellant's consent. Because appellant had no complaint about the 136–day delay from arrest to the February trial date, we are led to focus on this 113–day delay between February 25 and June 18. From the trial court's description of its considerations for continuing the February 25 trial date, as contained in its order, it is clear the trial court continued the trial date in the interests of the due administration of justice and after hearing from appellant's lawyer that he favored a continuance. It is equally clear the prosecutor opposed a continuance. Because the additional felony charges grew out of the same set of facts which all knew existed on October 13, 1990, the prosecutor saw no legitimate need for a continuance.

We are at a loss to understand why appellant thought his investigator needed more time to investigate in light of the additional charges. The facts had not changed. Appellant now argues that the prosecutor's decision to file the two additional charges was a ploy to pressure appellant into a plea of some kind rather than maintain his innocence and go to trial. Appellant offers no evidence, only speculation, in support of that argument. Regardless of whether a ploy was in progress, the facts surrounding the alleged assaults on October 13, 1990, had not changed. Further investigation of those facts in light of the additional charges was not reasonably necessary. However that may be, appellant's lawyer argued for a continuance. He obviously did not show either orally or in writing on January 30, 1991, that the delay might prejudice appellant's defense. We simply fail to see how the delay beyond the February 25 trial date can be rationally attributed to the prosecution. Appellant has presented no evidence that the prosecutor was seeking a delay—let alone delay for an evil purpose or to gain advantage.

The trial court established June 18 as the new trial date when it issued its order

dated April 29, 1991. Appellant's lawyer, and the prosecutor, approved that order as to form. With that order in hand, notifying him of the new trial date fifty days hence, appellant's lawyer at that time neither orally nor in writing showed the trial court how that delay might prejudice appellant. From April 29, to May 21, appellant made no complaint about the new trial date. On May 22, however, appellant filed his speedy trial motion. In that motion, he alleged prejudice, but he failed to state facts showing it. He failed to attach any affidavit sworn to by anyone which contained any statement of facts going to prejudice. When the trial court heard the motion and testimony of appellant's investigator in support of the motion on May 30, the trial court did not hear statements of fact showing prejudice to appellant's defense caused by delay in going to trial. The investigator's testimony was to the effect that he had had difficulty locating several witnesses, but he did not attribute that difficulty to the delay in going to trial. From a fair reading of his testimony, one can only conclude that the difficulty in locating witnesses, a difficulty experienced not only by appellant but also by the prosecution, was attributable to the lifestyle and circumstances of the witnesses. Regardless of when the trial date would have been established, those witnesses would have been difficult to locate. Appellant failed to show any connection between the delay and the difficulty in locating witnesses.

In summary, of the 249 days between arrest and trial, the first 136 days of that period was acceptable to appellant. He made no complaint about it, and he did not try to show any prejudice to his defense caused by it. As to the remaining 113 days of that period, appellant argued for a delay, made no complaint about delay until relatively late in that period, and failed to show any prejudice to his defense caused by delay. We do not find that any portion of that 113–day period was attributable to the prosecution; the trial court allowed that time period to pass in the interests of the due administration of justice and with the consent of appellant. Considering the above and foregoing discussion, we hold that appellant's right to speedy trial was not violated in this case.

## II

## DEPUTY SHERIFF'S VOUCHING FOR VICTIM'S CREDIBILITY/EXPRESSING OPINION OF APPELLANT'S GUILT

■ The prosecution's first of nine witnesses was Deputy Sheriff James Nethercott who initially interviewed the victim at the house to which she had fled after her encounter at appellant's mobile home. During the early stages of the deputy sheriff's direct examination, the prosecutor asked preliminary questions concerning the witness' employment and experience, the witness' response to the radio dispatch message to investigate the victim's complaint, and the witness' observation of the victim's physical appearance. After the witness stated that the victim was shivering, shaking, and crying, the prosecutor asked, "What did you do at that point?" The witness replied, "I listened to her story and *made a determination that she had been raped,* and I placed her in my patrol car to take her to the hospital." (Emphasis added.) Appellant's lawyer did not object to this answer and did not move to strike it. The witness' direct examination continued for some time. Early in appellant's cross-examination of this witness, appellant's lawyer asked, "And you also told the jury that in your opinion Mr. Whiteplume had raped the [victim], right?" The witness answered, "Yes."

On appeal, appellant asserts that the witness' direct examination testimony "I listened to her story and made a determination that she had been raped" constitutes error per se in two respects. He contends that in the specific testimony the witness has expressed two inadmissible opinions, one being that appellant is guilty and the other that the victim is telling the truth. He relies on *Bennett v. State,* 794 P.2d 879 (Wyo.1990) and *Stephens v. State,* 774 P.2d 60 (Wyo.1989) as prohibiting the former and on *Stephens* and *Zabel v. State,* 765 P.2d 357 (Wyo.1988) as prohibiting the latter.

Appellant points out that the identity of the alleged assailant was not a factual issue; rather, the only issue to be decided by the jury was whether or not the sexual activity between the alleged victim and the alleged assailant was consensual. On this sole factual issue, appellant argues that the prosecution's case against him was weak. Although the victim had testified that appellant had applied a salve of some kind to the dildo before inserting it into the victim's vagina, the hospital emergency room physician testified he had not noted the presence of any salves or lubricants in the victim's vagina, although he added it is difficult to detect their presence. This same witness also testified that he found no vaginal tears. A forensic scientist from the Wyoming State Crime Laboratory testified she found the presence of seminal fluid on the victim's panties. Although the blood type of that fluid was consistent with appellant's blood type, she was unable to determine if the enzyme type from the fluid was consistent with appellant's enzyme type. She conceded on cross-examination, however, that although she could not exclude him completely as being the source of the seminal fluid found in victim's panties, her test results would lead one generally to the conclusion that the fluid was not appellant's. Finally, appellant emphasizes that although the victim told one of the investigating law enforcement officers that appellant had threatened her with a gun at the time of the alleged assault, those officers never found a gun when they searched appellant and his mobile home.

Appellant contends that his situation is similar to that in *Bennett,* 794 P.2d 879. There, the accused's lawyer was cross-examining the state's chief witness, a law enforcement officer. In defense counsel's effort to impeach the witness' credibility, defense counsel asked the witness whether, before the events giving rise to the charges for which the accused was on trial, the witness suspected the accused of being a drug dealer. The witness answered that he had. During the prosecutor's redirect examination, the prosecutor asked the witness why he had held that suspicion. The

defense counsel objected. Following discussion among counsel and the trial court, the latter instructed the witness to limit his answer to facts introduced to that point in the trial. Instead of so limiting his answer, the witness testified not about opinion-supporting facts pre-existing the events giving rise to the charges being tried, but about the very events giving rise to those charges. The result was "a direct statement of [the witness'] opinion that [the accused] is guilty" of the charges being tried. *Id.* at 882. Relying on *Stephens,* 774 P.2d at 60, we held the opinion testimony as to the accused's guilt was error per se "because it is impossible to determine whether the jury may have relied on the expressed opinion in reaching its verdict." *Bennett,* 794 P.2d at 881. We stated that "[T]o permit jurors to rely on a witness's opinion of the defendant's guilt 'would be the ultimate abdication of the function of the jury.'" *Id.* quoting *Stephens,* 774 P.2d at 64. In *Stephens,* we held error per se existed when the prosecutor expressly asked several witnesses whether they had formed an opinion about the identity of the person who had sexually molested the victim and to state that opinion, which each witness then did. *Stephens,* 774 P.2d at 64–67.

Countering appellant's argument, the state points out that in Deputy Sheriff Nethercott's direct examination testimony "I listened to her story and made a determination that she had been raped," he never identified appellant by name and never expressly stated he held an opinion that the victim was telling the truth. The state notes that the prosecutor here, unlike *Bennett,* did not ask the witness if he had formed an opinion about appellant and to state that opinion. Moreover, the state asserts that it was defense counsel who jumped to the conclusion as to the assailant's identity when, on cross-examination, defense counsel asked the rhetorical question, "And you also told the jury that in your opinion Mr. Whiteplume had raped the [victim], right?" The error, if any, was invited error, claims the state, and cannot

be grounds for reversal. *Rands v. State,* 818 P.2d 44, 49 (Wyo.1991).

We agree with the state that appellant may not cry foul as to the deputy sheriff's cross-examination testimony in direct response to defense counsel's rhetorical question. *See Haworth v. State,* 840 P.2d 912, 922–923 (Wyo.1992). But we do not perceive that appellant is crying foul about that exchange. Rather, appellant is complaining solely about the deputy sheriff's expression of his unsolicited opinion on direct examination. We are disturbed by several aspects of that testimony. First, the deputy sheriff is a highly experienced law enforcement officer, having served for fifteen years, having about 1,500 hours of law enforcement training, and having investigated about seventy rapes. He is also well educated, having earned both a bachelor's degree in psychology and a master's degree. Considering his experience in law enforcement investigations, we presume he had experience testifying in court. We think that such a well educated, trained, and experienced law enforcement officer would know better than to answer the question "What did you do next?" with the answer "I made the determination that she had been raped." When he interviewed the alleged victim, the deputy sheriff was in the earliest stages of his investigation. Although he did not know at that point in time where the investigation would go or how extensive it would be, he surely knew that much basic work would have to be done. That basic work would include the work that actually was done in this case: several interviews of the victim and of appellant, physical examinations of the victim and appellant, laboratory work, and so on. It seems reasonable to believe that an experienced law enforcement officer would not have made a "rape determination" so early in the investigative process. Further, it seems reasonable to believe that an experienced law enforcement officer testifying at a trial would know that he could express an opinion about his "rape determination" only if the precise question were asked of him. Of course, there is no proof in the record that the deputy sheriff deliberately injected his "rape determination" opinion

into his testimony. On facial examination of the context of the direct examination of this witness, utterance of the "rape determination" opinion appears inadvertent. We are unable to know with certainty what was in his mind or heart when he uttered those words.

Examining the language, "I listened to her story and made a determination that she had been raped," we think that a jury hearing that testimony would reasonably draw the conclusion that he believed her when she told him she had been raped. That belief supported her credibility. Her credibility was one of the two aspects of the sole issue to be resolved by the jury, which was whether the sexual activity was consensual. The other aspect of that issue was appellant's credibility.

It is true that what happened here is more subtle than what happened in *Bennett* and *Stephens.* In those cases, counsel were openly bandying around the word "opinion" and the witnesses were directly asked to state expressly their opinions. Here, the prosecution did not ask the direct question. Instead of an express "opinion," the witness gave an inferential "determination." In both *Bennett* and *Stephens,* the prosecution had strong cases against the accused. *Stephens,* 774 P.2d at 63; *Bennett,* 794 P.2d at 883. Here, the prosecution's case against appellant is somewhat tenuous, especially considering the quality of the victim's testimony. That tenuousness makes more difficult the judicial task of measuring the effect of the error on the jury's verdict.

In *Lessard v. State,* 719 P.2d 227 (Wyo. 1986), a first degree sexual assault case, we carefully considered a rape crisis counselor's direct examination testimony elicited by the prosecutor. Over defense counsel's objection, the trial court allowed the counselor to testify that the victim's asking the assailant not to tell about the assault was a commonly recognized phenomenon in such cases. *Id.* at 233. In holding that the counselor's opinion of why sexual assault victims usually ask assailants not to tell was not an impermissible opinion that the

victim's testimony was truthful, we explained:

> In the process the expert did not say that she believed or held any opinion with respect to the victim's version of the events surrounding the assault. She did not vouch for the truth of the victim's testimony, and we will not so construe the opinion which she furnished.

*Id.* at 233–34.

Having carefully considered Deputy Sheriff Nethercott's "rape determination" testimony in the light of *Lessard*, we can only conclude that Nethercott, unlike the counselor in *Lessard*, did infer that he believed or held an opinion with respect to the victim's version of the events surrounding the assault. He linked his "rape determination" only with "her story." We can construe his "rape determination" as nothing less than his inferential vouching for the truth of the victim's testimony. In this specific regard, this case is different from *Brown v. State*, 736 P.2d 1110 (Wyo.1987), in which we held, among other things, no error existed when the clinical psychologist testified without objection that in her opinion the prosecutrix was the victim of sexual molestation. *Id.* at 1114–15. In *Brown*, the trial court allowed the clinical psychologist to testify about the results of several personality tests given to the victim; however, the trial court did not allow the witness to testify about either the victim's version of the assault or the witness' belief that the victim was telling the truth. *Id.* at 1114. Thus, in *Brown*, the test results, not the witness' opinion of the victim's credibility, was the link connecting the witness' opinion that the victim was a sexual molestation victim with the ultimate conclusion to be drawn by the jury that the victim was telling the truth. Here, in contrast, the link connecting the witness' determination that the victim had been raped with the ultimate conclusion to be drawn by the jury that the victim was telling the truth was only the witness' opinion of the victim's credibility.

In *Zabel*, under a plain error analysis, we held that a clinical psychologist's testimony of not having seen signs of fabrication of the victims' versions of the sexual abuse incidents, based upon that psychologist's testing and interviewing the victims, "constituted a psychologist's evaluation of whether the victims were lying in the 'reporting.'" 765 P.2d at 362. In measuring the quantum of harm caused by the error, we considered the strength of the prosecution's case against the accused. We found that the evidence of the accused's guilt was not overwhelming. *Id.* No physical evidence supported it; a close factual dispute existed in the testimonial evidence. We noted that credibility was the central jury issue. *Id.* at 363. In these several respects, similarities between *Zabel* and the instant case exist. In another respect, however, *Zabel* is different. There the prosecutor in closing argument relied on the psychologist's testimony about the victims' credibility. *Id.* at 363. Here, the prosecutor's closing argument makes no mention about the deputy sheriff's "rape determination" testimony.

In addition to the above and foregoing factors, we have also taken into account certain universally recognized trial practice dynamics. The deputy sheriff was the prosecution's first witness. The practicing trial bar is familiar with the theories of primacy and recency. The former theory holds that the jury tends to remember that which it hears first; the latter theory holds that the jury also tends to remember that which it hears last. Following the deputy sheriff's testimony, eleven other witnesses testified, including the victim and appellant. Appellant was the penultimate witness. Other than the victim and appellant, only one other witness testified about the activities happening between the victim and appellant at the latter's mobile home. That witness was a good friend of appellant's. At appellant's mobile home when he and the victim first arrived, this witness soon left to get more beer. Allegedly returning some time later, this witness did not see appellant and the victim, but only heard their voices through a bedroom door. The sum of his testimony was not particularly revealing.

The issue presented in the light of the factual backdrop of this case is a close one

that truly calls upon the most careful exercise of delicate judicial judgment. Weighing all of the above and foregoing factors, we conclude that the admission of the deputy sheriff's "rape determination" testimony undermines our judicial confidence in the jury's verdict. Consequently, we hold that a reasonable possibility exists that, had the jury not heard the deputy sheriff's "rape determination" testimony, the verdict might have been more favorable to appellant. On retrial, counsel and the trial judge shall take all appropriate measures to ensure that such testimony does not reach the jury.

Since a reasonable possibility exists that the remaining evidentiary issues assigned here as errors may recur at the retrial, we shall discuss them at this time.

## III

### SEXUAL ASSAULT COUNSELOR'S TESTIMONY EXCEEDING PERMISSIBLE SCOPE OF PRETRIAL DESIGNATION/VOUCHING FOR VICTIM'S CREDIBILITY

█ The prosecution's ninth and last witness was Jacque Taylor, Director for the Office on Family Violence and Sexual Assault in Riverton, Wyoming. The prosecution's witness list filed with the trial court designated that this witness would testify as follows: "Ms. Taylor will testify as to the statements of the victim, her physical and emotional condition, and foundation of photographs of the victim". The trial court ruled that Ms. Taylor could not testify about the alleged victim's statements to her.

The prosecution's early direct examination of Ms. Taylor covered her educational background, past and current employment, the nature of the work done by her and the Office on Family Violence and Sexual Assault, her specialized training in dealing with victims of sexual assault including the use of rape kits and counseling both victims and perpetrators, her experience in conducting training sessions dealing with victims, and her particular experience in dealing with thousands of victims over the last ten years. When the examination turned to Ms. Taylor's personal experiences in dealing with sexual assault victims, it became evident to defense counsel that the prosecution might be trying to qualify Ms. Taylor as an expert witness for the purpose of expanding the scope of her designated testimony. The trial court announced a recess and met with counsel in chambers so that defense counsel could raise an objection concerning the scope of Ms. Taylor's testimony.

In chambers, the prosecution confirmed defense counsel's suspicion that the prosecution intended to use Ms. Taylor as an expert witness to testify about rape victims and how they act. The prosecution explained that it had to use Ms. Taylor for this purpose because of the trial court had earlier ruled that Dr. Jeff Clausel, whom the prosecution had initially intended to use for this purpose, could not testify. Although the trial court recognized that Ms. Taylor was an expert in her field, it explained that the defense would be prejudiced unfairly by the proposed expansion of the scope of Ms. Taylor's designated testimony since the defense had released its own expert witness on the subject in reliance on the trial court's earlier ruling barring Dr. Clausel's testimony. Consequently, the trial court ruled that the prosecution was limited to the scope of Ms. Taylor's testimony as designated earlier.

When the trial resumed after the recess, the prosecution asked Ms. Taylor whether she had been called out on a sexual assault call on October 13, 1990. Without objection, she answered: "I was called to the hospital. I was informed that a rape victim was en route to the hospital and I was to meet her there."

On appeal, appellant asserts that Ms. Taylor, by stating that she was to meet a rape victim at the hospital, vouched for the victim's credibility and was testifying as an expert witness in violation of the trial court's ruling limiting the scope of her testimony to the victim's physical and emotional condition and foundation for the photographs taken. Appellant argues that this testimony violated *Stephens*. We dis-

agree. Examining Ms. Taylor's testimony in context, we conclude she stated that she was asked to go to the hospital. The jury could have understood her testimony only in that limited sense and not in the sense argued by appellant. By no stretch of the imagination can it be concluded that by such innocuous testimony Ms. Taylor was vouching for the victim's credibility. We hold, therefore, that this testimony did not violate *Stephens*. Further, we find that this testimony was preliminary in nature and simply established factual foundation for Ms. Taylor's visit to the hospital where she met the victim and observed her physical and emotional condition. Clearly, this testimony did not exceed the scope of her designated testimony. In this latter respect, since defense counsel made no objection at trial, the alleged error has not been preserved for appeal.

Later on in Ms. Taylor's direct examination, the trial court allowed her to testify, over defense counsel's objection that her testimony about the rape kit examination procedure was exceeding the scope of her designated testimony. On appeal, appellant does not challenge the trial court's ruling on the admissibility of this facet of Ms. Taylor's testimony. Rather, appellant challenges a later phase of her testimony in which she was answering the prosecution's question asking her to describe the victim's emotional state at points in time two days after the assault and since that date. In answering the question, Ms. Taylor testified:

> She's experienced some fairly typical responses in denial and minimization of the incident, fear around—

At which point, defense counsel interrupted, making the following speaking objection:

> Your honor, we're getting outside again.
>
> I hate to keep standing up, but this witness was—she's attempting to testify in an expert capacity at this point when she's talking about fairly normal and standard reactions and stuff.
>
> She wasn't listed to testify as to those things, and they're trying to back-door it in here now.

The trial court then instructed Ms. Taylor to "[j]ust answer the question. Exactly what has her emotional state been since October 15th?" Ms. Taylor then described it.

On appeal, appellant claims that Ms. Taylor's testimony "She's experienced some fairly typical responses in denial and minimization of the incident, fear around—" amounted to a vouching for the victim's credibility in direct violation of *Stephens*. We have carefully considered the testimony in context and noted that the defense counsel interrupted and objected before Ms. Taylor completed that portion of her testimony and that the trial judge then instructed Ms. Taylor to limit her answer to what she observed. We do not believe Ms. Taylor's partial answer went so far as to rise to a *Stephens* violation. Although the language "fairly typical responses" suggests the witness is comparing the victim's emotional state with the pattern of emotional behavior generally observed in other sexual assault victims, we have held that such comparison testimony from a properly qualified and offered expert witness is admissible and does not amount to vouching for the victim's credibility. *Griego v. State*, 761 P.2d 973, 978–79 (Wyo.1988); *Scadden v. State*, 732 P.2d 1036, 1044–48 (Wyo.1987); and *Lessard*, 719 P.2d at 233–34. The real gravamen of appellant's complaint is reduced, therefore, to Ms. Taylor's having started to testify as an expert and beyond the scope of her designated testimony. Appellant dismissed his expert witness because the trial court's ruling that the prosecution would have no expert testimony of this nature. We agree that had Ms. Taylor's testimony gone unchecked so that her expert testimony in full bloom would have reached the jury, then appellant's complaint would be well taken. Under the circumstances, however, the trial court appropriately nipped in the bud Ms. Taylor's expert testimony. We hold that no error occurred. On retrial, we are confident this scenario will not be repeated.

## IV

### HEARSAY TESTIMONY

Appellant points to three instances of Deputy Sheriff Nethercott's direct exami-

nation testimony in which hearsay testimony was admitted.

■ The first instance occurred when the deputy sheriff described what he did after placing the victim in his patrol car to take her to the hospital. He testified that as they left for the hospital, "[the victim] pointed out a trailer and said that was the house where she was raped." Although defense counsel neither objected nor moved to have the answer stricken, the trial court cautioned the prosecutor about asking questions calling for hearsay testimony. On appeal appellant presents a plain error argument. Our plain error doctrine is well established:

> The "plain-error" doctrine will be applied only where the error seriously affects the fairness or integrity of judicial proceedings. There must be a transgression of a clear and unequivocal rule of law, in a clear and obvious way, which adversely affects a substantial right.

*Jones v. State,* 580 P.2d 1150, 1153 (Wyo. 1978) (citations omitted).

In a brief but sweeping argument, appellant asserts that the deputy sheriff's testimony "[she] said that was the house where she was raped" amounted to a statement that appellant raped the victim and provided additional corroborative force to her testimony. Appellant adds that the statement was offered to prove the truth of the matter asserted, i.e., she was raped, and that he was denied his constitutional right to confrontation.

The state takes issue with appellant's assertions, arguing that the testimony was not hearsay under Wyo.R.Evid. 801(c) since it was not offered for the truth of the assertion "she was raped," but only to show that she identified a mobile home where the encounter happened. Alternatively, the state contends that if the testimony was hearsay, it qualifies as an excited utterance exception under Wyo.R.Evid. 803(2), since the victim was under the stress of excitement caused by her encounter with appellant when she pointed out the mobile home on her way to the hospital. The state contends that appellant has failed to demonstrate the violation of a clear and

unequivocal rule of law and to prove the denial of a substantial right under the circumstances.

We are inclined to agree with the state's position. Although the record is clear as to the testimony complained about, we hold that appellant has failed to demonstrate the "transgression of a clear and unequivocal rule of law in a clear and obvious way." *Jones,* 580 P.2d at 1153. Considering the deputy sheriff's testimony in context, we cannot say that the brief portion complained about seriously affected the fairness or integrity of the trial.

■ The second instance about which appellant complains occurred when the deputy sheriff testified that the victim told him she had left her clothing in appellant's trailer and "described them as being Wrangler blue jeans with Garfield panties." Defense counsel lodged a hearsay objection as soon as the description was given. The trial court sustained the objection, but noted that the question had been answered. Defense counsel did not then move to have the trial court strike the answer from the record and instruct the jury to disregard the answer.

Once again, appellant presents the same brief, sweeping argument. The state counters that the testimony was not prejudicial, pointing out that both the victim and appellant testified that she left her clothing, except for her shirt, when she ran from the mobile home. We agree with the state's position. We fail to see any prejudice to appellant on this point. He never disputed that the victim's articles of clothing were in his mobile home, and allowed the deputy sheriff to take them. We hold that no error is demonstrated.

■ The third instance about which appellant complains occurred when the deputy sheriff testified about his interview of the victim at the hospital cafeteria: "I learned that a dildo had been used." Upon hearing that testimony, defense counsel objected on hearsay grounds and moved that it be stricken. The trial court overruled the objection.

Appellant again relies on the same brief, sweeping argument presented on the other instances assigned as error. The state answers that argument by claiming the evidentiary ruling was within the exercise of the trial court's sound discretion and no abuse of that discretion has been shown. *Gentry v. State*, 806 P.2d 1269, 1271 (Wyo. 1991). Once again, we agree with the state. Appellant did not dispute his possession of the dildo or his use of it on the victim. The only issue was whether his use of it was with her consent. Appellant testified at several points about these matters. Consequently, we fail to see how he was possibly prejudiced by the admission of the testimony in question. We hold that no error occurred when the trial court admitted this testimony.

In summary, we are reversing and remanding for a new trial because the deputy sheriff's unsolicited testimony, that he determined the victim had been raped after hearing her story, amounted to error per se as the inadmissible expression of an opinion of the victim's credibility. Since credibility was the chief jury issue in this case, we are compelled to return this case for retrial with the strong admonition that this type of error not recur.

Reversed and remanded for trial.

CARDINE, J., files a dissenting opinion.

CARDINE, Justice, dissenting.

I dissent because I totally disagree with the majority's conclusion "that a reasonable possibility exists that, had the jury not heard the deputy sheriff's 'rape determination' testimony, the verdict might have been more favorable to the appellant."

The entire statement by Sheriff Deputy James Nethercott, which the majority finds destroyed the entire trial, was:

I listened to her story and made a determination that she had been raped, and I placed her in my patrol car to take her to the hospital.

The prosecutor did nothing to elicit the deputy sheriff's opinion. There is no evidence that the witness was advised to make the statement, despite the majority's suggestion that this might be so. But more important, it is clear that the statement was no more than an explanation of why the deputy was taking the victim to the hospital for a rape evidentiary examination. His determination at that time was really not very earth shattering in view of the facts then determined. Defense counsel failed to object, and for good reason. It was obvious that it was simply an explanation for the next step in his investigation: *i.e.,* taking the victim to the hospital. The message this court sends to law enforcement now is that the approved testimony will be, "I determined she had not been raped, but decided to take her to the hospital for a rape evidentiary exam anyway." This court was not present at the trial and cannot know the dynamics of the courtroom scene. Had we been present, I am sure we also would have been impressed by the lack of concern by all. To trial counsel, the statement was a preliminary explanation to the next step in the investigation. To different appellate counsel, it was something to seize upon from a search of the record.

The detective testified that when he arrived at the Hurst's house, he found the victim crying and hysterical, and he observed bruises on her arms and her breast, as well as scrapes on her shoulder and thigh. He testified that, based on his experience, he concluded that the injuries which he observed were fresh. She was clad only in a shirt and was crying and shivering. She had called the police herself to report the rape. Each of these observations and statements were made just before the deputy sheriff determined she had been raped and took her to the hospital. There was significant credible evidence in addition to her statement that would lead any reasonable, experienced police officer to believe she had been raped by someone, and that is all the officer said in a preliminary way to explain taking her to the hospital. Under no stretch of the imagination can we fairly say that Officer Nethercott relied upon the statement of the victim alone and thus was vouching for her credibility.

This was a four-day trial that produced over 700 pages of transcript. The trial

included the testimony of 11 witnesses and countless numbers of words. The majority undermines a competent jury verdict based upon a few words spoken by a single witness and taken out of context. These few words were uttered without any of the typical trial fanfare associated with contentious evidence. No trial is perfect, as is evident here, but the record does not present sufficient evidence to usurp a jury's authority. Because the deputy sheriff's statement was only one of many during a lengthy trial and because the statement was based on more than just his opinion as to the victim's credibility, I find it impossible to believe that the deputy's statement so moved the jury that for the next three days they were unable to hear and consider the evidence and fairly decide the case.

The statement did not affect a substantial right for three important reasons. First, the time and manner of the admission of the deputy sheriff's statement was of no greater significance to the jury than any of the other voluminous testimony. Second, the deputy sheriff's statement and determination were clearly grounded on more than his opinion of the credibility of the victim's story. Third, there was no objection. Defense counsel must not have thought it as important as this court for he did not object. Lack of objection invokes the plain error doctrine. For plain error to be present, three elements must be established: First, the record must clearly show what occurred at the trial without resort to speculation. Second, the existence of a clear and unequivocal rule of law must have been violated in an obvious way. Third, this violation must have adversely affected some substantial right of the accused. *Monn v. State,* 811 P.2d 1004, 1006 (Wyo.1991); *Rands v. State,* 818 P.2d 44, 48 (Wyo.1991). There was not violation of a clear and unequivocal rule of law as would constitute plain error. The conviction should be affirmed.