David METZGER, Appellant (Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

No. 99–85.

Supreme Court of Wyoming.

April 14, 2000.

Rehearing Denied June 12, 2000.

Representing Appellant: Sylvia Lee Hackl, State Public Defender; Donna Domonkos, Appellate Counsel; Diane E. Courselle, Director, Wyoming Defender Aid Program; and Brett N. Huff, Student Intern. Argument presented by Mr. Huff.

Representing Appellee: Gay Woodhouse, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Theodore E. Lauer, Director, Prosecution Assistance Program; and Lori L. Brand, Student Intern. Argument presented by Ms. Brand.

Before LEHMAN, C.J., and THOMAS, MACY, GOLDEN, and HILL, JJ.

HILL, Justice.

Appellant, David Metzger (Metzger), seeks review of his convictions and sentences for two counts of indecent liberties with a child. Metzger asserts that witnesses were erroneously permitted to vouch for the credibility of the victim, that the trial court abused its discretion in denying a motion for mistrial, that the jury was not adequately or clearly instructed, and that the prosecutor engaged in prejudicial misconduct throughout the trial. We conclude that no reversible errors occurred and, hence, we affirm.

## ISSUES

Metzger raises these issues:

I. Did the trial court abuse its discretion by allowing one expert witness and one lay witness to testify that they believed the alleged victim when she accused Mr. Metzger of these crimes?

II. Should the trial court have immediately granted a mistrial after a prosecution witness testified to inadmissible and highly prejudicial hearsay evidence that included accusations of uncharged misconduct; was the court's failure to do so an abuse of discretion?

III. Was jury Instruction 3, describing the two counts against Mr. Metzger based on the Information filed in this case, ambiguous because it gave the jurors no way to distinguish between the two counts charged?

IV. Did the prosecutor deprive appellant of his due process right to a fair trial by: (1) Appealing to the passions and prejudices of the jury, (2) appealing to community outrage in voir dire and in his closing argument, (3) asking questions during his direct examination that encouraged prejudicial hearsay testimony, and (4) addressing 404(b) evidence during his closing argument that was outside the permissible scope of its admissibility at trial?

The State submits this summary of the issues:

IA. Did the district court abuse its discretion when it permitted a witness on cross-examination by the State to testify that his Department of Family Services investigative report, stating that there was insufficient credible evidence to substantiate the child victim's allegations, did not

mean that he did not believe what the child victim told him?

IB. Was plain error committed when the child victim's father testified that, when she acknowledged to him that she was telling the truth, he believed her?

II. Did the district court abuse its discretion when it denied appellant's request for a mistrial after a child witness testified to what the child victim had told her?

III. Did the trial court properly instruct the jury with respect to both charges of indecent liberties with a minor?

IV. Did the prosecutor commit prosecutorial misconduct in voir dire, in his questioning of witnesses, or in his closing argument?

## FACTS

In order to achieve as great a level of clarity as possible, and at the same time preserve the anonymity of child witnesses and their parents, we set out below a list of the principal participants as we will refer to them throughout this opinion:

Metzger: As noted above, he is the appellant in this case.

EM: Is the victim of the crimes of which Metzger stands convicted. EM was Metzger's niece and was eight years of age at the time of the incidents.

Father: Is father to EM and brother to Metzger. At the time the crimes were committed, Metzger was living with his brother and his family because he was unemployed.

Mother: Is mother to EM.

AG: Is another minor female. Metzger pleaded *nolo contendere* to taking indecent liberties with her. At the time of that occurrence, she was seven years of age. That event occurred closely in time to the crimes at issue in this appeal. AG was a friend of EM and a frequent visitor to EM's home.

In addition to the above persons, we will also make reference to the testimony of several other witnesses, but their identities will be clear in context as we set out the other material facts pertinent to the resolution of the issues raised in this appeal.

This case originated when EM began having difficulties at school. Her Mother sought the assistance of school counselors in order to address EM's deteriorating behavior and school grades. After an initial evaluation at school, EM was referred to mental health experts for more aggressive counseling and treatment. In the first session, EM broke down sobbing and revealed that Metzger had compelled her to touch his "privates" on two separate occasions. Later questioning disclosed that what EM meant by "privates" was Metzger's penis. Metzger lived in the same household as EM and often served as her babysitter if neither parent nor EM's older brother was available to supervise her. EM's revelations came in early December of 1997, over a year and one-half after the crimes occurred. An investigation was completed, and Metzger was charged with two counts of knowingly taking immodest, immoral or indecent liberties with a child in violation Wyo. Stat. § 14–3–105 (Michie 1994 Supp.).[1]

## DISCUSSION

### Testimony Vouching for the Credibility of EM

Metzger contends that two witnesses were allowed to testify to the credibility of EM, and that those errors are of critical importance in this case because the only evidence supporting the convictions was the report made by EM. We accept the premise that

---

1. Although it does not alter in any way our decision in this case, we deem it prudent to explain a little about the history of § 14–3–105 because it is an area of law where there has been some misunderstanding. Section 14–3–105 was amended in 1996, but that amendment was not effective until March 19, 1996. In this case, the crimes were alleged to have been committed between March 1, 1996, and May 31, 1996.

Therefore, that statute must be applied as it appeared on March 1, 1996. 1996 Wyo. Sess. Laws Ch. 73 § 2. This statute was again amended in 1997 and under those amendments a charge such as that in issue here would be required to be brought under Wyo. Stat. Ann. § 6–2–304(a)(ii) (LEXIS 1999). 1997 Wyo. Sess. Laws Ch. 135 §§ 1, 4 (effective July 1, 1997).

the only evidence linking Metzger with these crimes was the testimony of EM.

We embark on our analysis by restating our holding in *Stephens v. State*, 774 P.2d 60 (Wyo.1989). Our conclusion in that case was that reversal of a conviction for violation of § 14–3–105 was compelled because two expert witnesses who were called to testify by the State were permitted to testify, over defense objections, to their opinions that the victim's father was the perpetrator of the crime. 774 P.2d at 65, 66. No such testimony was permitted in this case. A second part of our holding was that a third expert who was called as a witness by the State was permitted to testify that the victim told him that the perpetrator was his father and, further, in response to the question posed by the prosecutor, "Do you believe [the victim]?" the expert answered, "Yes." 774 P.2d at 66. Our conclusion in *Stephens* was that "testimony offering an opinion as to the guilt of the defendant, when elicited by a prosecuting attorney, should be perceived as error *per se.*" 774 P.2d at 68. We also rested our decision in *Stephens* on the conclusion that it is error to permit an expert to vouch for the credibility of a victim who did testify. *Id.*

In the instant case, it was the defense who called the so-called "expert" witness who gave erroneous testimony. The record does not reflect that he was treated or qualified as an expert witness, but certainly his testimony suggested that he was a person who could be perceived by the jury as an expert. That witness was Mike Baden, a child protection investigator for the Department of Family Services, who testified under direct examination by counsel for Metzger that he had prepared a report concerning the allegations made by EM. At defense counsel's insistence, she was permitted to treat Baden as a hostile witness. In his report, Baden concluded that EM's complaint was "unsubstantiated" and that "... the report of the child victim does not by itself constitute sufficient credible evidence." Defense counsel also elicited from Baden that he considered EM's case terminated because of his report. On cross examination, the prosecuting attorney asked Baden a number of questions about that same report and the meaning of the conclusions quoted above, including his conclusion that sexual contact had occurred. Ultimately, the following exchange between Baden and the prosecutor took place before the jury:

Q. The last thing that Ms. Johnson [defense attorney] went over with you is the report that there was insufficient credible evidence to substantiate the report. And you concluded that, did you not, Mr. Baden?

A. Yes, I did.

Q. Does that mean that you didn't believe [EM] when you talked to her on January 8th?

MS. JOHNSON: I'm going to object to that. He can't testify to the witness's credibility.

THE COURT: I think it goes more to his conclusion and his belief, as it would affect that conclusion.

So I would admonish the jury that witnesses generally can't comment on the truth or believability of other witnesses. But I'll allow it for the limited purpose of reflecting what his conclusion was and how that may fit in.

I'll overrule. You may answer.

Q. (By Mr. Schafer) What was your conclusion, as part of your investigation, in speaking with Pat Carr and with [EM]?

A. I believe that [EM] was a good witness and appeared to be testifying truthfully.

Q. And what you were saying is that you needed more than just her statement to substantiate the report?

A. By our rules and regulations, yes.

Mr. Baden's overall testimony established that the Department of Family Services rules and regulations require that reports such as that affecting EM must be completed within 60 days, that almost 30 days had passed before the Casper Police Department and Baden could get to the investigation (because of conflicts associated with the Christmas/New Year holidays of 1997–98), and that the remaining 30 days allowed him only enough time to assess the risks to the child, but not much more. A significant element in

his conclusion that the report was "unsubstantiated" was that EM was no longer at risk because the alleged perpetrator was no longer in the home.

As is readily evident, there is virtually no similarity between this case and the scenario in *Stephens*. Here, counsel for Metzger used a witness with expertise to create a factual suggestion that the witness did not believe EM, *i.e.*, that her testimony was not "credible." Therefore, in view of the "open door" doctrine and, in particular, in view of the limiting instruction given by the trial court, we conclude that the trial court did not abuse its discretion in permitting the disputed question to be asked and answered. *See Sanville v. State*, 593 P.2d 1340, 1344–45 (Wyo.1979). Likewise, we see no significant parallel with our decision in *Whiteplume v. State*, 841 P.2d 1332 (Wyo.1992). In that case, we held that reversal of a conviction for sexual assault was required because an experienced law enforcement officer "volunteered" an opinion as to the guilt of the defendant and to the credibility of the victim under circumstances that made it appear that it was not done inadvertently. We also concluded that in light of the totality of the circumstances of the *Whiteplume* case: "[T]his case is a close one that truly calls upon the most careful exercise of delicate judicial judgment." 841 P.2d at 1337–41.

A second important factor in *Whiteplume* was the tenuousness of the State's case and the quality of the victim's testimony, much of which was not corroborated; indeed much of it was contradicted by, the physical evidence. 841 P.2d at 1338–39. Unlike *Whiteplume*, here the victim's credibility was attacked on the basis that EM was a chronic "liar" in other respects, not on the basis that her testimony as to the crime was inherently suspect. Our conclusion is that the facts of this case also require "careful exercise of delicate judicial judgment," but we are compelled to exercise that judgment to hold that the testimony of Mr. Baden was not error *per se* requiring reversal of Metzger's conviction.

■ Metzger also asserts as error testimony of EM's Father which was directed to EM's credibility. That assertion of error played out in the transcript as follows (Father is being questioned by the prosecutor about his reactions to hearing his daughter tell him of the indecent liberties):

Q. How did you react to that?

A. I was furious.

Q. Did you try to talk to her about it more specifically?

A. No. I'd ask her a few questions, you know, to help ease my mind, to come up with the same solution.

Q. What—do you recall the questions you asked?

A. I'd asked her if—that she has to really make sure of what she was saying, make sure that she was telling the truth.

Q. And what kind of response did you get to those questions?

A. Same response that I got when she told me in the office.

Q. What was that?

A. What [Metzger] had her do.

Q. She acknowledged to you that she was telling you the truth?

A. Yes.

Q. Okay. Do you believe her?

A. Yes, sir.

■ Father's testimony then continues along the lines that he drove to Montana where he believed Metzger lived and intended to confront him. However, Father never did find Metzger, and he returned home to Casper. No objection was interposed to Father's testimony, nor did Metzger ask for any remedial action, other than that the trial court declare a mistrial. The parties agree, as do we, that this assertion of error must be treated under the plain error doctrine and was not error *per se*. *Newport v. State*, 983 P.2d 1213, 1216 (Wyo.1999); *Dudley v. State*, 951 P.2d 1176, 1178–80 (Wyo.1998). The plain error doctrine requires us to make this series of findings: (1) The record must clearly present the incident; (2) appellant must demonstrate that a clear and unequivocal rule of law was violated in a clear and obvious, not merely arguable, way; and (3) that appellant was denied a substantial right resulting in material prejudice to him. *Newport*, 983 P.2d at 1216. In the context of this

issue, we again note that the substance of Metzger's defense was that EM was a habitual liar, and that she was coerced by her Mother to tell this lie about Metzger so she could get him out of the house. Mother denied this allegation. That issue was pressed with EM's Mother before Father testified. The basis for the challenge to EM's credibility by the defense was that Mother had coerced her daughter into lying to Father to cover up for Mother's bingo/gambling habit. Father was also pressed about the issue of both Mother and EM lying about those things. It is clearly established in the record that EM did, at her Mother's insistence, lie about Mother and EM going to play bingo. However, this was the only evidence which supported the theory that EM was a liar. Thus, in overall context, the question was not so much directed at Father vouching for his daughter's credibility and/or Metzger's guilt, as it was a confirmation that he did not view her as a liar, and was little more than a father stating that he believed his daughter. Nonetheless, in order to give the benefit of the doubt to Metzger and to underscore our admonitions to prosecuting attorneys that such testimony may result in reversal of a conviction, we conclude that the first element of the test was met, i.e., the record clearly reflects the objectionable testimony. In addition, the prosecutor did ask EM's Father if he believed his daughter, and so we are also compelled to conclude that a clear and unequivocal rule of law was violated in a clear and obvious way. However, we are unable to conclude that Metzger has established that the error affected a substantial right. In other words, that there was a reasonable possibility that in the absence of the error, the verdict might have been more favorable to him. *See Brown v. State*, 953 P.2d 1170, 1182 (Wyo.1998). The prosecutor did not seek to take advantage of that testimony in his closing argument. Indeed, the focus of his closing was on the inherent believability of EM's story, not that others had voiced a belief in her credibility. The jury was fully and properly instructed on their role in determining the credibility of witnesses. The defense did not ask for a corrective instruction at the time the testimony came in, nor later, when the jury was finally instructed at the conclusion of the trial. As noted above, the gist of Father's testimony was that he was shocked and outraged at his child's revelation that she had been abused by his own brother, implicitly suggesting throughout that testimony that he believed his daughter. Under the totality of the circumstances presented, we decline to conclude that the verdict might have been more favorable if Father had not been asked the offending questions. Thus, the third prong of the plain error test has not been met, and, therefore, we decline to hold this to be reversible error.

### *Testimony of AG*

AG's initial testimony was an account of the circumstances wherein Metzger committed an act of indecent liberties on her. She was then asked by the prosecutor what she did after that event occurred:

Q. And then what did you do?

A. I told [EM], 'Lets go to the park and play.'

Q. Why did you want to go to the park?

A. Because I needed to talk to her.

Q. Why did you need to talk to her?

A. Because I needed to tell her what her uncle did to me.

Q. You wanted to tell her what her uncle did?

A. Yeah.

Q. And did you tell her?

A. Yes.

Q. And what did [EM] say?

A. 'He does that all the time to—

MS. JOHNSON: Your Honor, I'm going to object to that. That's hearsay.

THE COURT: I'll sustain. The last two questions and responses are stricken. It's hearsay.

Q. (By Mr. Schafer) And then after that, what did you do?

A. We were riding on the bikes. I was behind her, and I told her, 'Your uncle touched me in the private.' She said, "Well, its all right. He does it to me all the time."

Q. Okay.

THE COURT: I'd make the same rulings since I think there was an objection pending to the hearsay statements of [EM].

I'd ask the jury to disregard the hearsay statements. Thank you.

Early on in the proceedings, the trial court had determined that AG's testimony could come in as proper evidence under W.R.E. 404(b) and that ruling of the trial court is not challenged here. The challenge asserts that the prosecutor's "calculated" questioning went beyond the trial court's ruling. Rule 404(b) provides:

> (b) *Other crimes, wrongs, or acts.*—Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

It is clear from our past decisions that the trial court properly allowed AG to testify to this prior crime. *Elliott v. State*, 600 P.2d 1044, 1047–49 (Wyo.1979). Keeping in mind that this was a witness who was nine years old at the time she testified, and the overall context of AG's testimony, we conclude that the witness's hearsay statements were inadvertent and not a deliberate effort by the prosecutor to get the witness to introduce that hearsay into evidence. The trial court immediately corrected the problem by instructing the jury to disregard both of AG's hearsay responses. We must assume that the jury followed the court's curative instruction. *Burke v. State*, 746 P.2d 852, 857 (Wyo. 1987). Metzger asks that we rely instead on our holding in *Zabel v. State*, 765 P.2d 357, 363 (Wyo.1988) that curative action cannot take the sting out of every mistake, *i.e.*, we do not always presume that the jury will follow the court's curative instructions. In *Zabel*, we declined to follow our usual rule because an expert's testimony led the jury through a truthfulness evaluation (of a victim under circumstances similar to this case) which ultimately told the jury that the victim was truthful and the defendant was guilty. In this case, AG's stricken statements did tend to corroborate EM's accusations; however, the trial court's remedial action was immediate and comprehensive. Under the circumstances of this case, we opt to follow our general rule that the jury did obey the corrective instructions utilized by the trial court.

In this regard, Metzger also asserts that the trial court abused its discretion in denying his contemporaneous motion for mistrial. The denial of a motion for mistrial is a ruling made in the sound discretion of the trial court and can be reversed only when that discretion has been abused. *Miller v. State*, 955 P.2d 892, 898 (Wyo.1998). We find no abuse of discretion under the circumstances presented here.

### Jury Instruction 3 was too Ambiguous

Metzger asserts that the instructions given to the jury were not adequate to guide the jury through their decision-making process. In particular, Metzger complains that Instruction No. 3 left the jury in the dark as to any sort of differentiation between count I and count II and left open the possibility that the jury was not required to reach unanimous verdicts.

The standard for assessing such a claim of error is well-established. Jury instructions should inform the jurors concerning the applicable law so that they can apply that law to their findings with respect to the material facts; instructions should be written with the particular facts and legal theories of each case in mind and often differ from case to case since any one of several instructional options may be legally correct; a failure to give an instruction on an essential element of a criminal offense is fundamental error, as is a confusing or misleading instruction; the test whether a jury has been properly instructed on the necessary elements of a crime is whether the instructions leave no doubt as to the circumstances under which the crime can be found to have been committed. *Compton v. State*, 931 P.2d 936, 939–40 (Wyo.1997) (*citing Miller v. State*, 904 P.2d 344, 348 (Wyo.1995)).

W.R.Cr.P. 3(b)(1) requires that an information contain "a plain, concise and definite

written statement of the essential facts constituting the offense charged." That rule, which corresponds to F.R.Cr.P. 7(c)(1), has this mission:

> Rule 7(c)(1)—put an end to 'the rules of technical and formalized pleading which had characterized an earlier era.' The complex requirements of common-law criminal pleading and of some state practices are now obsolete. State procedural requirements are not controlling. The precision and detail formerly demanded are no longer required, imperfections of form that are not prejudicial are disregarded, and common sense and reason prevail over technicalities.
>
> The fundamental functions and requirements of an indictment have not been modified, and it is still essential that every element of an offense be stated and that the defendant be given fair notice of the charge against him, but the rule now permits a plain, concise, and definite statement of the essential facts constituting the offense.

1 Charles Alan Wright, Federal Practice and Procedure: Criminal 3d § 123, pp. 529–32 (1999).

Jury Instruction No. 3 contained this language:

> YOU ARE INSTRUCTED that the information in this case provides as follows:
>
> COMES NOW Michael W. Schafer, Assistant District Attorney, Seventh Judicial District, State of Wyoming, and in the name and by the authority of the State of Wyoming informs the Court and gives the Court to understand that DAVID METZGER, late of the county aforesaid, on or between the 1st day of March, 1996, and the 31st day of May, 1996, in the County of Natrona, in the State of Wyoming, did unlawfully

#### COUNT I

and knowingly take immodest, immoral or indecent liberties with a child, to wit:

[EM], born 8/5/87, in violation of W.S.1977, as amended, § 14–3–105,

#### COUNT II

THAT DAVID METZGER, late of the county aforesaid, on or between the 1st day of March, 1996, and the 31st day of May, 1996, in the County of Natrona, in the State of Wyoming, did unlawfully and knowingly take immodest, immoral or indecent liberties with a child, to wit: [EM], born 8/5/87, in violation of W.S.1977, as amended, § 14–3–105,

> contrary to the form of the statute in such case made and provided, and against the peace and dignity of the State of Wyoming.

The affidavit attached to the information clearly sets out two incidents of indecent liberties which occurred two or three weeks apart. Based on statements given by EM, and corroborated and fleshed out by information obtained from Mother, the incidents had to have occurred sometime after March 1, 1996 [2], on Sunday nights [3], but not later than May 31, 1996.

Instruction No. 4 contained the usual proviso: "The information in this case is only a formal charge and is not to be considered [as] evidence of guilt on the part of the defendant. Nothing is to be taken by implication against him."

Instruction No. 6 provided:

> The elements of the crime of Indecent Liberties with a Child, as charged in Count I and II in this case, are:
>
> 1. On or between the 1st day of March, 1996 and the 31st day of May, 1996
>
> 2. In Natrona County Wyoming
>
> 3. The Defendant, David Metzger
>
> 4. Knowingly
>
> 5. Took immodest, immoral or indecent liberties
>
> 6. With [EM], a child.
>
> If you find from your consideration of all of the evidence that each of these elements

---

2. EM's brother received a football for his birthday on March 1, 1996, and said she remembered that when the first incident occurred, her brother was out playing football.

3. This fact was established because EM said her parents were gone bowling when the incidents occurred. Her parents bowled on Sunday nights.

has been proved beyond a reasonable doubt, then you should find the defendant guilty.

If, on the other hand, you find from your consideration of all of the evidence that any of these elements has not been proved beyond a reasonable doubt, then you should find the defendant not guilty.

Instruction No. 14 provided:

The defendant, David Metzger, has been charged in this case with two counts in the Information. Each count, and the evidence pertaining to it, should be considered separately by the jury. The fact that you might find the defendant guilty or not guilty as to a crime charged in one count of the Information should not control your verdict as to any other crime charged in any other count of the Information.

Finally, we note that the verdict form required the jury to make separate findings as to each count, and that the testimony given by EM clearly described two separate incidents. EM was not able to pinpoint the dates on which each incident occurred, something not uncommon for an eight-year-old child. In this regard, we also note that the record does not disclose that Metzger offered any instructions that might have improved upon those given by the district court.

Based upon this analysis, we conclude that the instructions given by the district court met all of the fundamental requirements of jury instructions in a criminal case. The trial court committed no error in instructing the jury.

### *Prosecutorial Misconduct*

 In this argument, Metzger claims that the prosecutor's conduct during voir dire, the trial itself, and in closing argument, evidenced a calculated strategy which crossed the line of fundamental fairness and deprived Metzger of his constitutional rights to due process of law and a fair trial.

Claims of prosecutorial misconduct are settled by reference to the *entire* record and hinge on whether a defendant's case has been so prejudiced as to constitute denial of a fair trial. Similarly, the propriety of any comment within a closing argu-

ment is measured in the context of the *entire* argument. A trial court's rulings as to the scope of permissible argument will not be disturbed absent a 'clear or patent' abuse of discretion. Even then, reversal is not warranted unless a reasonable probability exists, absent the error, that the appellant may have enjoyed a more favorable verdict.

*Gayler v. State*, 957 P.2d 855, 860 (Wyo.1998) (*citing Arevalo v. State*, 939 P.2d 228, 230 (Wyo.1997) (emphasis in original)). Moreover, reversal of a conviction will not be ordered as punishment for a prosecutor's misdeeds, but only because such misdeeds denied the accused a fair trial. *Jeschke v. State*, 642 P.2d 1298, 1302 (Wyo.1982).

 During voir dire, the prosecutor posed this series of questions to the jury panel:

I want to talk to you a little bit about the dynamics of being involved—in children being involved in a sexual abuse case, and you people, and people in general.

Does anybody have a problem with the notion that people use children for sexual gratification?

(No verbal response)

Is anybody here so innocent [as] to believe that that simply cannot happen in this society, in this community right here, in Casper, Wyoming? Does anybody believe that?

(No verbal response)

You would be surprised that once in a while that's true.

Does anybody here on this panel that I'm addressing believe that there is more proof required when a child is a victim versus when an adult is a victim?

(No verbal response)

First, we take note that no objections were made to any of the questions. We also note that during voir dire, counsel for the defense asked many questions along the same lines as those asked by the prosecutor. Indeed, this issue might have been posed in its opposite form had the questions asked by both sides been prohibited by the trial court. Metzger suggests that the questioning at issue violated the spirit and the letter of

W.R.Cr.P. 24(c)(2) (improper for counsel to precondition jurors to a particular result, etc.). It is our view that the questioning at issue was consistent with, and was the sort of questioning contemplated by, W.R.Cr.P. 24(c)(1): "The only purpose of the examination [of jurors] is to select a panel of jurors who will fairly and impartially hear the evidence and render a just verdict." This being so, we do not detect prosecutorial misconduct in the conduct of voir dire.

As a second prong of the prosecutorial misconduct argument, Metzger iterates the issues we decided in the first two arguments discussed above, i.e., eliciting testimony from witnesses that vouched for the credibility of EM, and eliciting improper hearsay from a witness. Having determined above that no reversible error occurred in those respects, we decline to hold them to constitute prosecutorial misconduct.

As the third prong of this argument, Metzger contends that the prosecutor, in his closing argument: Misstated the evidence; engaged in impermissible use of W.R.E. 404(b) evidence that was admitted for a limited purpose; appealed to community outrage; and engaged in improper comments on the credibility of the victim. In addition, Metzger asserts that the cumulative effect of the prosecutor's argument deprived Metzger of a fair trial.

■ Metzger asserts that the prosecutor misstated the evidence in that during closing argument he linked Metzger to Mr. Baden's reports concerning EM, even though Metzger's name was never mentioned in the reports. It is correct that Baden testified that Metzger's name did not appear in the reports. However, we conclude that it was a fair inference and fair argument that the overall thrust of Baden's testimony clearly suggested that Metzger was the "threat" to EM whom Baden referred to in his report. There was no prosecutorial misconduct in this regard.

■ Metzger asserts it was misconduct by the prosecutor to have suggested to the jury that AG's testimony be used for a purpose beyond that permitted by W.R.E. 404(b). Counsel for the defense objected to that argument, the objection was sustained, and the jury was instructed by the trial court to disregard it. Perhaps quite wisely, the prosecutor returned to his seat and indicated he had no further rebuttal argument to make. It is apparent that the trial court agreed that the prosecutor's final comment to the jury was objectionable; however, that objection was handled in the proper and usual manner by instructing the jury to disregard it. Although the comment was mistaken and ill-advised, under these circumstances we cannot discern misconduct.

■ Metzger asserts that the following portion of the prosecutor's closing was misconduct on the basis that it appealed to community outrage in Casper about the sexual abuse of children and imposed a "job" on the jury:

> You ladies and gentlemen have an opportunity—probably an opportunity that you won't be proud of, but, nonetheless, an opportunity of a lifetime to convict a child sexual abuser and make the community a better place for children to live and grow up in.
>
> And I ask you ladies and gentlemen to do your job. Thank you.

Once again, we must note at the outset that no objection was made to this portion of the prosecution's argument. More importantly, it simply was not the sort of "join the war on crime/send a message to criminals" argument that we condemned in *Gayler*, 957 P.2d at 860–62. We do not perceive the comment as suggesting that Metzger should be convicted because there is a problem with child sexual abuse in the community. Rather, we perceive the argument to be one suggesting that Metzger should be convicted because he was guilty, and the community (and perhaps a larger community than just Casper) would be a safer place for that. We see nothing improper in such an argument.

■ Metzger also claims that the prosecutor argued that both Mother and Father testified in their daughter's trial because they believed their daughter, thereby vouching for EM's credibility. In context, that argument was one directed at the defense's contention that Mother had coerced her

daughter into fabricating her whole story in order to get Metzger, whom she did not like, out of her home, and that Father believed his daughter, as well as his wife, when she denied coercing her daughter to fabricate such a story. Again, no objections were made at the time and, again, we perceive the argument, in context, to be a fair response to the defense's theory of the case.

Finally, Metzger claims that all of the asserted errors recited above had a cumulative effect of denying him his right to a fair trial. Since we have found none of them to represent prosecutorial misconduct, it must, of necessity, follow that there could be no cumulative error in the prosecutor's closing argument.

## CONCLUSION

Having found no error warranting reversal of Metzger's convictions, we affirm the judgment and sentence of the district court in all respects.

GOLDEN, J., dissenting, with whom MACY, J., joins.

I respectfully disagree with the majority opinion's resolution of the issue entitled *Testimony Vouching for the Credibility of EM.* That issue concerns the testimony of two witnesses, Mike Baden, a child protection investigator for the Department of Family Services, and EM's father.

Under defense counsel's direct examination, Baden testified generally about his investigation of the report of suspected abuse of EM on behalf of his Department, which included interviews of EM and EM's mother. Then, he testified as follows:

Q. Okay. And after you've taken all the notes, after the interview with [mother] and [EM], did you come to a conclusion?

A. Yes, I did.

Q. Okay. And is it common practice in your job to make some determination whether or not the claim of abuse can be substantiated or unsubstantiated?

A. We are required, with any investigation, to enter a finding of substantiated or unsubstantiated.

Q. And can you tell the ladies and gentlemen of the jury what unsubstantiated means?

A. Unsubstantiated means that there was not credible evidence to show that the child was currently in danger.

Q. And at the end of this report entitled "Abuse/Neglect Investigation Interview Notes," what was your conclusion?

A. Abuse was unsubstantiated at that time.

Q. That was because there was unsubstantiated evidence to show that the child was currently in danger, and you indicated that the case would be reopened if law enforcement developed more information.

A. That is correct.

Q. And as an appendage to the abuse interview notes, you prepare a summary as well, correct?

A. That is correct.

Q. Okay. And in that summary, under paragraph four, you're required to put your findings down, correct?

A. That is correct.

Q. Okay. And would you agree with me that there were two subsections under "Worker's Findings," one substantiated and one unsubstantiated, correct?

A. Excuse me. I didn't follow that.

Q. Under paragraph four, there's a place for you if you substantiate—

A. On the form itself?

Q. There's a place for you to substantiate the allegations or to unsubstantiate them.

A. That is correct.

Q. And on that piece of paper, you unsubstantiated the allegations?

A. That is correct.

Q. And you said in that report—it was your reasoning that "the report of the child victim does not by itself constitute sufficient credible evidence."

A. That is what I wrote, yes.

* * *

Q. Then, as part of your duties, Mr. Baden, you prepared what's called a "Notice of Conclusions"; is that correct?

A. That is correct.

Q. And that Notice of Conclusions is basically what you, as the investigator, concluded in the case?

A. That's correct.

Q. And you have to prepare that as part of your duties?

A. Yes.

Q. And the Notice of Conclusions is sent to the family of the child that you're investigating; is that correct?

A. The Notice of Conclusions is to be sent to the family of the—well, the caretakers of the child and to the alleged perpetrator.

Q. And on this—do you recall doing a Notice of Conclusions on February 10, 1998?

A. That sounds correct.

Q. Okay. And on your—in the conclusion on February 10, 1998, you indicated that "The Division had concluded that all allegations of abuse and/or neglect are unsubstantiated," correct?

A. As I recall, that was the box that was checked.

Q. Okay. And under the comments that you made, was it your opinion that the testimony of [EM] by itself did not constitute enough credible evidence to enter David's name into the central registry for sexual offenders?

A. I believe that's what I wrote.

Q. And the conclusions were based on your interviews with [EM] and her mother, correct?

A. Yes, and in light of the rules and regulations governing child abuse.

* * *

Q. Mr. Baden, as part of your duties at the Department of Family Services, you also do what's called a "Routing Slip." Are you familiar with that?

A. Yes, I am.

Q. And that Routing Slip basically indicates the action that the agency had taken and the reason for that action; is that correct?

A. It's more of just an internal memo as to where the case file should go.

Q. Does that stay with the case file?

A. Yes, it does.

Q. It doesn't go out to the family or anybody else, correct?

A. That is correct.

* * *

Q. I'm handing you what's been marked as Defense Exhibit C. Do you recognize that, sir?

A. This appears to be the Routing Slip that I attached to the case file.

Q. And it indicates that the action that you had taken in this case was unsubstantiated. So at this point in time, the case concerning [EM] is terminated in your office; is that correct?

A. That's correct.

Q. As far as you know, there's been no further developments for law enforcement, right? Let me rephrase that.

As far as you know, to date, there has been no further developments by law enforcement which would make you reopen the case?

A. There has been, and that would be this action here today.

Q. So the case is open today, as far as you're concerned?

A. No. This is a tough one to explain. The outcome of this could cause the case to be reopened.

Q. Okay.

On cross-examination, the prosecutor elicited Mr. Baden's further testimony in this way:

Q. Okay. [Defense counsel] also asked you what "not substantiated" meant, and you indicated "child currently not in danger"; is that correct?

A. That is correct.

Q. What is your primary concern when being a Child Protection Investigator?

A. To assess the safety of the child in question.

Q. And is that what you were doing when you investigated this case and rendered your "not substantiated" indication?

A. That is correct.

Q. Now, not substantiated, meaning child not currently in danger—does that mean that the abuse did not occur?

A. No, it does not mean that.

Q. So what's your primary concern when you are trying to substantiate or not substantiate an investigation?

A. My job is to assess the risk to the child.

Q. To assess the risk. Okay. And did you do that in regard to the Metzger family in this case?

A. Yes, I did.

\* \* \*

Q. That last thing that [defense counsel] went over with you is the report that there was insufficient credible evidence to substantiate the report. And you concluded that, did you not, Mr. Baden?

A. Yes, I did.

Q. Does that mean that you didn't believe [EM] when you talked to her on January 8th?

[Defense counsel]: I'm going to object to that. He can't testify to the witness's credibility.

The Court: I think it goes more to his conclusion and his belief, as it would affect that conclusion.

So I would admonish the jury that witnesses generally can't comment on the truth or believability of other witnesses. But I'll allow it for the limited purpose of reflecting what his conclusion was and how that may have fit in.

I'll overrule. You may answer.

Q. [By prosecutor] What was your conclusion, as part of your investigation, in speaking with Pat Carr and speaking with [EM]?

A. I believe that [EM] herself was a good witness and appeared to be testifying truthfully.

Q. And what you were saying is that you needed more than just her statement to substantiate the report?

A. By our rules and regulations, yes.

The majority holds that the trial court's ruling, over defense counsel's objection, allowing Mr. Baden's opinion that EM "was a good witness and appeared to be testifying truthfully" to be placed before the jury was not reversible error under *Whiteplume*. The rationale is that defense counsel "used a witness with expertise to create a factual suggestion that the witness did not believe EM, *i.e.*, that her testimony was not 'credible;' " and that the "open door" doctrine applies. I think that rationale is incorrect. Defense counsel did not use Mr. Baden as an expert and did not offer him as a witness with expertise; he was offered simply as an administrative agency's fact investigator. Moreover, defense counsel did not, in my view of the testimony, use Mr. Baden to suggest that EM was not credible. To the contrary, defense counsel carefully questioned Mr. Baden about the meaning of "unsubstantiated" as used in his report and about Mr. Baden's conclusion that EM's statement, **by itself**, did not constitute sufficient credible evidence to enter the accused's name into the sex offenders central registry. I do not find that defense counsel "opened the door" to permit the jury to hear Mr. Baden's opinion that EM "was a good witness and appeared to be testifying truthfully." Limits exist to the open-door rule, especially when unfairly prejudicial testimony is involved. *Gayler v. State*, 957 P.2d 855, 859 (Wyo.1998). "We ... will not allow a prosecutor to engage in overkill which is only moderately justified by the defendant's opening of the door to a certain subject." *Id.* Mr. Baden's opinion invades the fact-finding province of the jury and is reversible error.

With respect to the testimony of the other witness, EM's father, the prosecutor on direct examination elicited by a direct question the father's opinion that he believed EM was telling him the truth. Although the majority concludes that this question and answer violated a clear and unequivocal rule of law in a clear and obvious way, it also concludes that the error did not affect a substantial right. I

disagree and rely on my dissenting views on this point expressed in *Newport v. State*, 983 P.2d 1213, 1220–21 (Wyo.1999).