BURKE, Justice.
[¶1] Appellant, Justin N. Spence, challenges his conviction for one count of incest. He contends the district court abused its discretion by allowing the State to elicit improper vouching testimony from an expert witness. We reverse and remand for a new trial.
ISSUE
[¶2] Did the district court abuse its discretion by permitting the State to use an expert to vouch for the credibility of the alleged victim?[1]
FACTS
[¶3] AS is Mr. Spence's niece. She was 14 at the time of the events at issue. According to AS, on July 4, 2014, she spent the night at Mr. Spence's home. His girlfriend at the time, now his wife, Mickie Spence, was also present. According to AS, that evening the three of them sat around the apartment watching TV, listening to music, and drinking alcoholic beverages. At some point, Mr. Spence went into the bathroom and sent her a text message saying that she was "so hot." AS texted Mr. Spence asking whether he had meant to send the message to Mickie, and he responded that he meant it for AS. Mr. Spence then sent her a picture of his penis and asked that she send him a nude photo of herself. AS initially refused, but Mr. Spence kept pushing the issue telling AS that if she didn't comply, "something was going to happen." AS went into another room and sent him a photo of herself in her bra. She then went out on the porch for a cigarette and was *273 joined by Mr. Spence. The two went back inside, and Mickie went to bed. AS again went outside, and Mr. Spence joined her on the porch. They each had a cigarette and when AS turned to go back inside, Mr. Spence pulled her onto his lap, held her, and kissed her. When he stopped, AS went back inside and sat on the couch. A little later, Mr. Spence came in and sat next to her. He then put one of his hands inside her pants and inserted two fingers in her vagina. AS then got up and again went out on the porch. Mr. Spence did not follow her.
[¶4] While on the porch, AS received a text from Lane Schmidt, who invited her to his apartment which was nearby. AS went to Mr. Schmidt's where she "had a drink" and the two "had sex." AS did not tell Mr. Schmidt about the encounter with Mr. Spence. She stayed at Mr. Schmidt's for about an hour and then returned to the apartment where she went to sleep on the couch. Prior to going to sleep, she and Mr. Spence exchanged texts with AS telling Mr. Spence that he "needed to go to bed." Early the next morning, she called her mother for a ride and left the apartment. She did not tell her mother about the incident.
[¶5] According to AS, the first person she told about the incident was one of her counselors, Kathryn Saltz. That conversation occurred on August 12, 2014, prior to a scheduled MDT meeting involving AS.[2] At the MDT meeting, Ms. Saltz advised the group that she had concerns about AS. Those concerns included "destructive type behavior with herself," her relationship with an eighteen-year-old male (Lane Schmidt), and "inappropriate sexual stuff between her and her uncle," Mr. Spence. Once those concerns were raised, the MDT meeting was terminated and law enforcement was notified. AS was then interviewed by Thermopolis police officer Melanie Kress, a Hot Springs County deputy, and DFS caseworker Christi Preuit.
[¶6] During that interview, AS was questioned about several matters, including her drug and alcohol use, possible involvement in a grass fire, lying to her mother about her whereabouts, association with adult males, self-harming by cutting, and having sex with Mr. Schmidt on July 4, 2014. When AS revealed she had sex with Mr. Schmidt, Officer Kress told her that Mr. Schmidt could be in trouble because he was eighteen years old. In response, AS explained she had sex with Mr. Schmidt because she was drunk and "Uncle Justin tried to do shit with me." During the interview, AS told the officers that Mr. Spence had patted her on the "butt" outside her clothing. She denied that Mr. Spence had touched "her private parts." AS was taken into protective custody at the end of the interview.
[¶7] Law enforcement interviewed Mr. Spence on August 22, 2014. He told the officers that AS had spent the night at his apartment but denied serving AS alcohol, asking her to send him a nude picture, or touching her inappropriately. He also told the officers that AS had sneaked out of the apartment to have sex with a neighbor. No criminal charges were brought against Mr. Spence at that time.
[¶8] After a brief period at a group home, AS was admitted to the Wyoming Behavioral Institute (WBI) in Casper for treatment of her emotional and behavioral issues. She was released from WBI in November 2014 and returned to live with her mother. According to one of her counselors, her condition and mindset did not improve and in less than two months AS was admitted to a residential psychiatric treatment facility in Utah. She stayed there for approximately six months. In March 2015, she returned to Thermopolis for a visit and Officer Kress and Ms. Preuit interviewed her again.
[¶9] During this interview, AS, for the first time, told the investigators that Mr. Spence had texted her a picture of his penis and demanded that she send him a nude photo of herself. She also told the officers about the kiss on the porch after Mickie went to bed and that, while on the couch, Mr. Spence put *274 his hand up her shorts and inserted his fingers in her vagina. She also stated that after she returned to the apartment, following her visit with Mr. Schmidt, she received a text from Mr. Spence asking why she had slept with Mr. Schmidt and not him. The next day, Mr. Spence told her to delete all of their text messages, and she did.
[¶10] Approximately eight months later, the State initiated criminal proceedings against Mr. Spence, charging him with one count of incest for having sexual contact with his niece, AS, between July 4 and July 5, 2014, in violation of Wyo. Stat. Ann. § 6-4-402(a)(ii) (LexisNexis 2017).[3] Mr. Spence pleaded not guilty and the matter proceeded to trial. AS was called as a witness by the State early in the trial. She testified about the incident. She was also questioned by the State about her delay in reporting, the inconsistent statements, and various behavioral issues. Those same issues were addressed extensively during cross-examination by defense counsel. Following her testimony, the State called Phillip Archibald, a therapist who counseled AS, as an expert witness. Mr. Archibald testified that he had diagnosed AS with post-traumatic stress disorder (PTSD) and, over objection, opined that the PTSD was caused by "the reported sexual abuse." The prosecutor emphasized this testimony during closing argument stating:
[W]e heard from Phil Archibald who said that that is what he diagnosed her as, and he told you what the symptoms would be. And one of the things that he told you was that the basis for that diagnosis was sexual abuse. And the sexual abuse that he determined was what took place on July 4, 2014.
The jury returned a guilty verdict, and Mr. Spence was sentenced to three to five years in prison with credit for time served. This appeal followed.
STANDARD OF REVIEW
[¶11] Mr. Spence objected to admission of the evidence he challenges in this appeal. Accordingly, we review for abuse of discretion. Garriott v. State , 2018 WY 4, ¶ 20, 408 P.3d 771, 780 (Wyo. 2018). "A trial court abuses its discretion when it could not have reasonably concluded as it did. In this context, 'reasonably' means sound judgment exercised with regard to what is right under the circumstances and without being arbitrary or capricious." Id. (internal citation omitted). Upon a finding of abuse of discretion, we must then determine whether the error was prejudicial. "An error is deemed prejudicial when there is a reasonable probability that, in the absence of the improper evidence, the verdict would have been more favorable to the appellant." Swett v. State , 2018 WY 144, ¶ 12, 431 P.3d 1135, 1140 (Wyo. 2018) (citations omitted).
DISCUSSION
[¶12] Mr. Spence contends that the district court erred by allowing AS's counselor, Phillip Archibald, to testify that the "underlying basis" of her PTSD was her "reported sexual abuse." He asserts that Mr. Archibald "impermissibly vouch[ed] for the credibility of [AS]." The State counters that Mr. Archibald's testimony was permissible to explain AS's symptoms and "her behavior," and that Mr. Archibald's testimony about the "underlying basis" of her PTSD was only "incidental[ ] bolster[ing]" of AS's credibility and not impermissible vouching.
[¶13] W.R.E. 702 permits the admission of opinion testimony from an expert witness if the expert's "specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." The rule, however, does not permit an expert to provide opinion testimony regarding the credibility of a witness because such testimony invades the province of the jury. "[T]he question of credibility is for the jury, who are themselves expert in that area." Zabel v. State , 765 P.2d 357, 360 (Wyo. 1988). In accord with that general rule, we have made it clear "that an expert witness cannot vouch *275 for the truthfulness or credibility of an alleged victim." Id. We have also recognized, however, that in an appropriate case:
Expert testimony that discusses the behavior and characteristics of sexual assault victims and the range of responses to sexual assault encountered by experts is admissible. Scadden v. State , 732 P.2d 1036 (Wyo. 1987). Such testimony is relevant and helpful in explaining to the jury the typical behavior patterns of adolescent victims of sexual assault. Griego v. State , 761 P.2d 973 (Wyo. 1988). It assists the jury in understanding some of the aspects of the behavior of victims .... Zabel v. State , 765 P.2d 357 (Wyo. 1988).
Chapman v. State , 2001 WY 25, ¶ 13, 18 P.3d 1164, 1170 (Wyo. 2001) (quoting Frenzel v. State , 849 P.2d 741, 748 (Wyo. 1993) ). The evidence is
relevant and admissible to dispel myths the public might hold concerning a child sexual abuse victim's post-abuse behavior if that behavior is an issue in the case.
Qualified experts on child sexual abuse may, therefore, use evidence of CSAAS characteristics of sexually abused children for the sole purpose of explaining a victim's specific behavior which might be incorrectly construed as inconsistent with an abuse victim or to rebut an attack on the victim's credibility. For example, if the facts of a particular case show that the victim delayed reporting the abuse, recanted the allegations, kept the abuse secretive, or was accommodating to the abuse, then testimony about that particular characteristic of CSAAS would be admissible to dispel any myths the jury may hold concerning that behavior.... However, expert testimony of CSAAS cannot be used for the purpose of proving whether the victim's claim of abuse is true.
Chapman , ¶ 13, 18 P.3d at 1171 (quoting Frenzel , 849 P.2d at 749 ).[4]
[¶14] Such testimony is admissible even though it may have the incidental effect of supporting the victim's credibility. "[I]ncidental bolstering of the victim's credibility alone does not make the expert testimony improper." Chapman , ¶ 20, 18 P.3d at 1173. However, there are limits to the scope of the expert's testimony. "We stress, however, that it is with great care that such testimony should be admitted. The pivotal question in determining the admissibility of PTSD testimony in sexual assault cases is the testimony's relevance to the issues in the case." Id. , ¶ 21, 18 P.3d at 1173. We have made it clear that "expert testimony ... cannot be used for the purpose of proving whether the victim's claim of abuse is true." Frenzel , 849 P.2d at 749 ; Chapman , ¶ 18 P.3d at 1172 ("[A] diagnosis of PTSD should not be used to prove the sexual abuse occurred.").
[¶15] There is no question that the credibility of AS was at issue prior to Mr. Archibald's testimony. Both the prosecutor and defense counsel addressed the issue of delayed reporting and differing statements from AS in their opening statements. AS was the second witness called by the State and the State inquired during direct examination about the prior statements. AS testified that she did not disclose the July 4, 2014 incident at Mr. Spence's apartment until August 12, 2014, which was 39 days after it occurred. Even then, she did not disclose the full extent of the alleged abuse. She did not tell the investigators that Mr. Spence had touched her genitals until March 2015, when she was home on a visit from treatment in Utah. AS testified that she had delayed reporting the full extent of Mr. Spence's abuse because she did not "want it to blow up" and "ruin[ ]" her family. She explained that, during her treatment in Utah, she learned she "was allowed to let it out and not feel bad about it." During cross-examination, defense counsel questioned AS extensively about her delayed reporting, her emotional and social problems prior to July 4, 2014, and her relationship with Mr. Schmidt.[5]
*276 [¶16] Mr. Archibald was the next witness called by the State. He testified that he counseled AS from October or November 2015 until August 2016. He diagnosed her with post-traumatic stress disorder (PTSD). Mr. Archibald explained that the criteria for a PTSD diagnosis are: 1) a stressor, which can include physical, emotional, or sexual trauma; 2) intrusive thoughts about the stressor, including "dreams, flashbacks, ... daily thoughts that can be ... delusional, ... [and] thoughts that take away time;" and 3) the intrusive thoughts interrupt normal functioning. Mr. Archibald said the symptoms of PTSD can be different in children than in adults. Because children "aren't able to express what [the] underlying anxiety is," they may exhibit behaviors that are not acceptable in school or public, or they may become socially isolated.
[¶17] The following colloquy then occurred between the prosecutor and Mr. Archibald:
Q. [H]ave you worked specifically with stress and/or anxiety disorders in your clients?
A. Yes, I have.
Q. How many cases do you think you've handled that involved anxiety or stress disorders in children?
A. Thirty plus.
Q. And in your employment, do you deal specifically [with] children or do you have a broad range of clients?
A. I have a broad range of clients.
Q. In the case[s] in which you dealt with children, did you render an opinion as to whether a child is abused - child abuse injuries had occurred?
A. Yes.
Q. And what specific symptoms of anxiety - of an anxiety or stress disorder would there be?
A. Can it be child abuse?
Q. Yes.
[¶18] Defense counsel objected, and the district court addressed the matter in chambers. Among other objections, defense counsel asserted that Mr. Archibald should not be permitted to vouch for AS's credibility. The State said the evidence was not offered to vouch for AS, but to explain her behavior:
[THE PROSECUTOR]: [M]y intention, Your Honor, is to have him ... establish the effects of trauma, which he has started to testify to, and specifically that he counseled and was the therapist for [AS], and what behaviors he saw, because we have had lots of testimony elicited from [AS] regarding her behaviors and her lack of credibility, and I think it goes to the potential reasons for that. And Mr. Archibald can testify, at least based upon his experience with her, as a function of being a therapist, what it is that he diagnosed her as, and the symptoms that that would have, that he saw, the basis of that, and whether sexual molestation can be a cause of a stress disorder, and what those symptoms would be, and how it would manifest itself. And we believe that this is not vouching, except that her credibility has been called into serious question by [defense counsel], and we believe that it is relevant to that.
...
THE COURT: What ultimate opinion, other than diagnosis, are you going to be asking him for?
[THE PROSECUTOR]: I'm going to be asking him to testify as to the ... what his opinion of his - the specific symptoms of PTSD, and memory issues, as well as scattered thoughts, as well as the disclosure portion of that, and specifically he can testify to his knowledge of [AS's] reluctance to testify - or to disclose, and why she would not have, based upon his knowledge of her in counseling. And we believe that's relevant because much has been made about the 39 -
THE COURT: What's the issue about memory? Where did that come from?
[THE PROSECUTOR]: Well, there [were] issues as to whether she remembered what happened in the various interviews, and *277 [defense counsel] made quite a bit about whether she remembered saying things or not remembered saying things, and whether she remembered them at one interview and then didn't remember them at another.
THE COURT: What about scattered thoughts, where did that come from?
[THE PROSECUTOR]: Well, the scattered thoughts were also part of the questioning of [AS] and the way in which she was disclosing both on the 12th of August as well as the 15th of March, 2016 (sic), and the - the scattered way in which she conveyed what happened. I don't have to get into scattered thoughts if this Court believes that was not developed enough for that to be testified to by Mr. Archibald.
But the State does believe that the length of time and the effects of disclosure are relevant because that is where [defense counsel] has gone with [AS]. "Why didn't you disclose? Why did you wait?"
THE COURT: Well, hasn't she explained it herself?
[THE PROSECUTOR]: She has explained that herself. I mean she has made testimony about that, but I think that as part of her psychological diagnosis and to further explain how it is that somebody would suffer from this type of trauma, we should be allowed to explain that.
THE COURT: Explain what?
[THE PROSECUTOR]: Why somebody in [AS's] position would not want to disclose and would be reluctant.
THE COURT: She just told us why. She didn't want to disclose because it was going to hurt her family; isn't that what she said?
[THE PROSECUTOR]: She did say that, yes.
THE COURT: Okay. I mean, you know, I don't know that a counselor needs to verify that that's why she said those things.
[THE PROSECUTOR]: Well, the counselor can explain what it is that - the cost of it would be to her, and she did not explain that.
THE COURT: The cost of it?
[THE PROSECUTOR]: The cost of losing all of her family members, becoming socially isolated, becoming ostracized in her family, so that would be the basis for not disclosing this on the 5th of July.
...
[DEFENSE COUNSEL]: I think it would be unduly prejudicial and I think it's just a backdoor way of kind of vouching for her, whether you call it explanation of trauma or whatever you want to call it, but you know, this is a pretty sophisticated 17-year-old girl. We're not talking about a 10-year-old or something, and she's explained herself. And she's - and you know, the Court has good questions, but I just think it's inappropriate.
The district court ruled:
THE COURT: Well, there's been enough testified to so far as to some rather different behavior of this young lady, I'm going to allow some testimony as it relates to her underlying diagnosis and the treatment for it.... [B]ut as far as getting into why she may have done something or didn't do something, she's already explained that.... I don't find that any kind of vouching is going on here, if we follow at least the diagnosis and treatment that she actually did have from this gentleman, so long as it's relevant, so ...
[THE PROSECUTOR]: And I believe that we can get into what the symptoms that were the underlying basis for the diagnosis?
THE COURT: Well, of course.... But beyond that, no, we're not talking about a 6-year-old and why someone might react a particular way, we have a 17-year-old describing what she remembered from a couple of years ago. She remembered it very explicitly, so I don't think there's anything that needs to be explained in that regard that would help the jury.
[¶19] Mr. Archibald testified he diagnosed AS with PTSD based upon information he gleaned from her, and he confirmed the diagnosis with notes from a former counselor. The State then elicited the following testimony from Mr. Archibald:
*278 Q. And what specifically, if you did, did you identify as the trauma that was the underlying basis for your diagnosis?
A. So the underlying basis was her reported sexual abuse.
[DEFENSE COUNSEL]: Your Honor, I think that's beyond the scope, I object, and from your ruling in chambers ask it [to] be stricken.
THE COURT: Overruled.
Q. [by the prosecutor] And Mr. Archibald, could you explain to us what the symptoms were of that diagnosis as you made it?
A. Yes, she was experiencing - first she had the known stressor that she reported she was experiencing; anxiety, social withdraw[al], she had flashbacks, nightmares that were recurrent. She also had some behaviors that were oppositional or that were - where she was avoiding school. She socially was unable to participate and function in a normal manner, and she was having current family stressors and concerns.
Q. When you say "current family stressors," what do you mean by that?
A. Her anxiety was increased over the loss of family support.
(Emphasis added.)
[¶20] Although Mr. Spence objected at trial to the admissibility of all PTSD testimony from Mr. Archibald, on appeal, he narrows his claim of error. He contends that Mr. Archibald's testimony crossed into improper vouching when he testified that the "reported sexual abuse" was the trauma that provided the "underlying basis" for his PTSD diagnosis. The State contends that, because Mr. Archibald did not directly comment on the credibility of AS, no improper vouching occurred.
[¶21] The State asserts that our decision in Chapman is "directly on point" and supports admission of the testimony. In Chapman , this Court addressed whether admission of expert testimony regarding post-traumatic stress disorder violated the rule against vouching for a victim's credibility in a sexual assault case. Id. , ¶¶ 20-21, 18 P.3d at 1173-74. Mr. Chapman appealed his conviction for two counts of indecent liberties with a minor and two counts of third-degree sexual assault. Id. , ¶ 1, 18 P.3d at 1167. Among other issues, he argued that the district court erred when it allowed an expert to testify about the theory of childhood sexual abuse and post-traumatic stress disorder. Id. , ¶ 2, 18 P.3d at 1167. The expert had testified about her meetings with the victim and her observations during those meetings. Id. , ¶ 9, 18 P.3d at 1169. She testified that "the victim exhibited symptoms of disassociation and depression." Id. She then explained "that it was common for victims of sexual abuse to delay reporting the abuse, become sexually active, and return to the abuser's home." Id. As one of his bases for challenging admission of the expert's testimony, Mr. Chapman argued that the expert had "vouched for the victim's credibility." Id. , ¶ 20, 18 P.3d at 1173. After reviewing the trial transcript, this Court concluded that the expert did not violate its rule against vouching because the expert's testimony "focused on general symptoms common to victims of sexual abuse and how those symptoms related to the victim." Id. We examined the challenged testimony from the expert and compared it to testimony we had reviewed in prior cases. We found that the expert did not testify "that she believed the victim's account of what happened such as in Stephens v. State ." Id. (referencing Stephens v. State , 774 P.2d 60, 65-68 (Wyo. 1989) ). We also determined that the testimony was not "like that in Whiteplume v. State , ... where the witness testified that he 'made a determination that [the victim] had been raped.' " Chapman , ¶ 20, 18 P.3d at 1173 (referencing Whiteplume v. State , 841 P.2d 1332, 1337 (Wyo. 1992) ). We found no error even though "the expert's testimony may have had the incidental effect of supporting the victim's credibility." Id.
[¶22] The expert testimony challenged in Chapman differs from the testimony at issue here. The expert in Chapman did not provide an opinion as to the cause of the victim's PTSD. In this case, Mr. Archibald was specifically asked by the prosecutor to identify the traumatic event that provided the basis for his PTSD diagnosis. He responded by identifying the "reported sexual abuse" as that event. The only "reported sexual abuse"
*279 at issue in this case was the abuse alleged to have been committed by Mr. Spence. The testimony is on par with testimony that we found to be improper in Whiteplume .
[¶23] In Whiteplume , the defendant was charged with first-degree sexual assault. A deputy sheriff who had investigated the case was the prosecution's first witness. He testified about his interview with the alleged victim shortly after the incident and his observations. He testified that the victim was "shivering, shaking, and crying." Id. , 841 P.2d at 1337. He was then asked by the prosecutor: "What did you do at that point?" Id. He replied: "I listened to her story and made a determination that she had been raped , and I placed her in my patrol car to take her to the hospital." Id. (emphasis in original). On appeal, we determined that the testimony constituted improper vouching and reversed the conviction. Id. at 1340-41. We explained:
Examining the language, "I listened to her story and made a determination that she had been raped," we think that a jury hearing that testimony would reasonably draw the conclusion that he believed her when she told him she had been raped. That belief supported her credibility. Her credibility was one of the two aspects of the sole issue to be resolved by the jury, which was whether the sexual activity was consensual. The other aspect of that issue was appellant's credibility.
Id. at 1339. After recognizing that the deputy did not expressly state that he believed the victim or held any opinion with respect to the victim's version of the events, we still concluded that the deputy had impermissibly vouched for the credibility of the victim:
[W]e can only conclude that [the deputy] did infer that he believed or held an opinion with respect to the victim's version of the events surrounding the assault. He linked his "rape determination" only with "her story." We can construe his "rape determination" as nothing less than his inferential vouching for the truth of the victim's testimony .
Id. at 1340 (emphasis added).
[¶24] The deputy's testimony in Whiteplume parallels Mr. Archibald's testimony in this case. Mr. Archibald did not expressly state that he believed AS. He did, however, inferentially vouch for her credibility. His opinion that the traumatic event causing the PTSD was the "reported sexual abuse" was necessarily "linked" with AS's version of the events. A jury hearing the testimony would reasonably draw the conclusion that Mr. Archibald believed AS.
[¶25] Our conclusion that impermissible vouching occurred in this case is consistent with our prohibition against the use of expert testimony to prove "whether the victim's claim of abuse is true." Frenzel , 849 P.2d at 749 ; Chapman , ¶ 13, 18 P.3d at 1171. The prohibition exists in large measure because such testimony impermissibly encroaches upon the jury's domain.
It almost goes without saying that the expert will not be allowed to state an opinion in terms of causality; in other words, the expert may not testify that the victim's PTSD symptoms were in fact caused by sexual abuse . This again vouches too much for the credibility of the victim and encroaches too far upon the province of the jury to determine the truthfulness of the witnesses.
State v. Alberico , 116 N.M. 156, 176, 861 P.2d 192, 212 (1993) (emphasis added).[6]
*280 [¶26] We must now determine whether this error was prejudicial. After reviewing the entire trial record, we conclude that it was prejudicial. The State's case largely depended on the credibility of AS, and it appears to be undisputed that there were significant concerns with her credibility. In general, those concerns provided the basis for admission of the PTSD evidence. According to the prosecutor, the evidence was relevant "because we have had lots of testimony elicited from [AS] regarding her behaviors and her lack of credibility, and I think it goes to the potential reasons for that." She continued, "her credibility has been called into serious question by [defense counsel], and we believe that it is relevant to that."
[¶27] Additionally, the prosecutor emphasized this testimony during closing argument when she told the jury:
[W]e heard from Phil Archibald who said that that is what he diagnosed her as, and he told you what the symptoms would be. And one of the things that he told you was that the basis for that diagnosis was sexual abuse. And the sexual abuse that he determined was what took place on July 4, 2014.
[¶28] The State attempts to minimize the impact of the testimony by pointing to cross-examination of Mr. Archibald where he conceded that there were other potential stressors in AS's life that could have been relevant to his diagnosis. However, in doing so, the State ignores the unmistakable fact that the only stressor that Mr. Archibald identified as the trauma that provided "the underlying basis" for his diagnosis of PTSD was the "reported sexual abuse." The challenged testimony did more than "incidentally bolster" the credibility of AS. Absent that testimony, we conclude that there is a reasonable probability that Mr. Spence would have enjoyed a more favorable verdict.
[¶29] Reversed and remanded.
KAUTZ, J., dissenting, in which BOOMGAARDEN, J., joins.
[¶30] I respectfully dissent. In this case, Mr. Archibald did not offer any opinion indicating he thought AS was being truthful. He did not offer any opinion indicating he believed a sexual assault had occurred. In other words, he did not vouch for AS. He also did not offer any opinion that Mr. Spence was guilty of sexually assaulting AS. Mr. Archibald simply did not provide any opinion which invaded the province of the jury to determine the credibility of witnesses. The trial judge appropriately considered Mr. Archibald's testimony in light of all the evidence in the case, found it sufficiently probative of an issue in the case, and properly overruled Mr. Spence's objection.
[¶31] Mr. Archibald testified as an expert witness and appropriately stated that PTSD occurs as a result of stressful trauma. He properly testified he diagnosed AS as suffering from PTSD. Chapman v. State, 2001 WY 25, ¶¶ 15-20, 18 P.3d 1164, 1171-73 (Wyo. 2001). He relevantly explained to the jury typical symptoms and behaviors of victims, and how AS's symptoms and behaviors showed she was suffering from PTSD. We have frequently recognized that a trial judge may admit such testimony because "it may assist the jury in understanding any inconsistent behavior exhibited by the victim." Sorensen v. State , 895 P.2d 454, 457 (Wyo. 1995), citing Frenzel v. State, 849 P.2d 741, 747 (Wyo. 1993) ; Griego v. State, 761 P.2d 973, 978-79 (Wyo. 1988) ; Scadden v. State, 732 P.2d 1036, 1046-47 (Wyo. 1987) ; Chapman , ¶ 13, 18 P.3d at 1170.
[¶32] The majority concludes the trial judge should not have permitted testimony from Mr. Archibald about the cause of AS's PTSD, as opposed to the symptoms or results of the PTSD, because such testimony amounted to "vouching." I conclude Mr. Archibald's statement that AS's "reported sexual abuse" was the stressor that led to his *281 PTSD diagnosis did not constitute vouching and was probative and admissible.
[¶33] In Wyoming, an expert witness cannot vouch for the truthfulness or credibility of an alleged victim. Lessard v. State, 719 P.2d 227, 233 (Wyo. 1986). There are two reasons for this rule. First, "the testimony of a psychologist or other expert on the issue of credibility does not assist (the jury) and therefore does not satisfy the requirements of Rule 702, W.R.E." Seward v. State, 2003 WY 116, ¶ 19, 76 P.3d 805, 814 (Wyo. 2003). Second, "we do not need or want a parade of 'truth or falsehood' experts invading the jury's traditional function by offering expert opinions of credibility." Id. , citing Wells v. State, 846 P.2d 589, 598 (Wyo. 1992). When considering these principles, however, we note that testimony assisting the jury "in understanding some aspect of the testimony of another witness that does not comment directly on that witness'[s] credibility or veracity is not invasive of the role of the jury." Id. , citing Saldana v. State, 846 P.2d 604, 618 (Wyo. 1993). The fact that the expert testimony may have incidentally bolstered the victim's credibility does not make the testimony improper. Chapman, ¶ 20, 18 P.3d at 1173.
[¶34] The reasons for the rule against vouching and for allowing proper expert testimony are tied to the basic requirement that evidence must be relevant to be admissible. Testimony which will not "assist the trier of fact to understand the evidence or to determine a fact in issue" as required by W.R.E. 702 is not relevant under W.R.E. 401 and 402. Evidence which would invite a "parade of truth or falsehood experts" and shift the focus of the trial to them would not be sufficiently relevant to outweigh the problems of confusing the issues-making it inadmissible under W.R.E. 403. On the other hand, evidence relevant to something other than the credibility of a witness is admissible. In Chapman, we summarized the connection between relevance and admissibility of expert PTSD testimony: "The pivotal question in determining the admissibility of PTSD testimony in sexual assault cases is the testimony's relevance to the issues in the case ...." Chapman , ¶ 21, 18 P.3d at 1173.
[¶35] There are at least two circumstances when testimony about the identified cause of a victim's PTSD would be admissible because it is relevant and helpful to a jury: First, it may be relevant when there is an issue of whether the victim had PTSD at all, and second, it is relevant when there is a claim that something other than the sexual assault caused the PTSD. The second circumstance exists in this case.
[¶36] The defense made the source of AS's stress and difficulties an issue before Mr. Archibald testified and continued that approach through cross-examination and argument.
1. Defense counsel cross-examined AS about moving early in her childhood, additional moving, her absent father who had drug issues, the loss of friends and her father resulting from moving back to Wyoming, and social difficulties and self-harm beginning before this incident. This questioning laid a foundation for the defense argument that other problems caused AS's PTSD symptoms, not the alleged incident.
2. Mr. Spence's counsel then cross-examined Mr. Archibald about the other stressors that can cause PTSD, about his diagnosis based on what he "gleaned" from AS at first and then confirmed from her prior records, and about AS potentially experiencing other stressors from "having to flee a biological father who has drug issues" and "abandonment." This questioning further implied other causes for PTSD.
3. In closing, defense counsel argued Mr. Archibald "makes this conclusion that she has perhaps PTSD based on some trauma or a stressor." He then argued something other than the assault caused AS's problems, stating "we know her family ... packed up in the middle of the night as they left an abusive situation in Arizona to come here," and "we know she was cutting before July 4, 2014."
[¶37] The source of AS's PTSD, as diagnosed by Mr. Archibald, was an issue. The defense argued something else acted as the stressor or stressors causing PTSD, and that it existed before the alleged incident. Mr. Archibald gave his opinion as to the source of the stressors, without commenting that AS
*282 was or was not telling the truth. The trial judge properly allowed the testimony because it was relevant to an issue in the case.
[¶38] Mr. Archibald's testimony is not at all like the testimony found to be improper vouching in Whiteplume v. State, 841 P.2d 1332 (Wyo. 1992). In Whiteplume, the deputy said he determined the victim had been raped. The only effect of allowing the deputy's opinion was to support the victim's claim. As such, the testimony was not relevant to any other issue in the case and did nothing but vouch for the victim's credibility-it was not helpful to the jury. Here, Mr. Archibald did not say he had determined that AS was the victim of incest or sexual abuse. He referred only to her "report[ ]" of sexual abuse in discussing the PTSD diagnosis.
[¶39] On the other hand, Mr. Archibald's testimony is similar to Chapman, ¶ 19, 18 P.3d at 1173, where we held the expert's statement that "she was seeing the victim due to 'a report of molestation from a family friend' " did not amount to an expression that the defendant was guilty or improper vouching. Mr. Archibald's statement is even less concerning than the expert's statement in Chapman because he did not identify the alleged perpetrator of the "reported sexual abuse." Chapman and the cases it relied upon allow evidence of "the existence of the disorder coupled with the absence of any triggering trauma, other than the evidence of [the charged crime], [to] aid the jury[.]" Chapman, ¶ 21, 18 P.3d at 1173-74 quoting State v. Allewalt, 308 Md. 89, 517 A.2d 741, 751 (Md. Ct. App. 1986).
[¶40] Chapman established that testimony like Mr. Archibald's is not improper vouching. It concluded "the expert's testimony here provided foundation for the expert's testimony and only indicates there had been a report of an assault. As such, it is not an opinion of guilt. " Chapman , ¶ 19, 18 P.3d at 1173 (emphasis added). That same situation exists in this case. Mr. Archibald's testimony provided a foundation for his other testimony, it was relevant and helpful to the finder of fact, and it was not an opinion of guilt or credibility.
[¶41] Having heard the evidence, with the issue of what caused AS's PTSD, the jury still had to evaluate the credibility of AS and of all other witnesses, including Mr. Archibald. It had to evaluate what weight, if any, to give his testimony. The trial judge instructed the jury that it was not required to accept any expert opinion. In context, Mr. Archibald's testimony was not vouching, but appropriate information the jury could consider in deciding the facts.
[¶42] The district court admitted Mr. Archibald's testimony in the context of the issues presented at trial. "Evidentiary rulings are within the sound discretion of the trial court and include determinations of the adequacy of foundation and relevancy, competency, materiality, and remoteness of the evidence. This court will generally accede to the trial court's determination of the admissibility of evidence unless that court clearly abused its discretion." Overson v. State , 2017 WY 4, ¶ 26, 386 P.3d 1149, 1154 (Wyo. 2017) ; Bean v. State , 2016 WY 48, ¶ 26, 373 P.3d 372, 381 (Wyo. 2016) ; Hill v. State, 2016 WY 27, ¶ 22, 371 P.3d 553, 560 (Wyo. 2016) ; Knospler v. State , 2016 WY 1, ¶ 12, 366 P.3d 479, 482 (Wyo. 2016) ; Lawrence v. State, 2015 WY 97, ¶ 10, 354 P.3d 77, 80 (Wyo. 2015) ; Sanchez v. State , 2006 WY 116, ¶ 25, 142 P.3d 1134, 1142 (Wyo. 2006) ; Wilks v. State, 2002 WY 100, ¶ 19, 49 P.3d 975, 984 (Wyo. 2002). We should accede to the trial court's determination in this case.
[¶43] I would affirm.

Mr. Spence also claims that his conviction should be reversed because of prosecutorial misconduct that occurred during closing argument. Because we find the first issue dispositive, we do not address this claim of error.

In early 2014, the State filed an educational neglect petition against AS's mother. See Wyo. Stat. Ann. §§ 14-3-202(a)(vii) (LexisNexis 2017); 14-3-402(a)(xii)(A); 14-3-411. In response, a multi-disciplinary team (MDT) was formed which included AS, her mother, her counselor, a DFS caseworker, and a deputy county attorney. See Wyo. Stat. Ann. § 14-3-427(b), (c) (requiring the juvenile court to appoint a "multidisciplinary team").

Section 6-4-402 states in relevant part:
(a) A person is guilty of incest if he knowingly commits ... sexual contact, as defined by W.S. 6-2-301(a)(vi), with an ancestor or descendant or a brother or sister of the whole or half blood. The relationships referred to herein include relationships of:
...
(ii) Blood relationships without regard to legitimacy[.]

In Frenzel , this Court was faced with the admissibility of testimony involving a victim's "Child Sexual Abuse Accommodation Syndrome" or "CSAAS." 849 P.2d at 744. In Chapman , we were faced with the admissibility of testimony involving a victim's PTSD. Chapman , ¶¶ 15-16, 18 P.3d at 1171-72. In Chapman , we adopted our analysis from Frenzel regarding CSAAS and applied it to PTSD. Chapman , ¶ 18 P.3d at 1172.

The defense's theory of the case was explained in the following jury instruction:
It is Justin Spence's contention that [AS] was confronted by her supervising agent, law enforcement and others on August 12, 2014 concerning her activities on the night of July 4, 2014 and she fabricated a story to implicate him. He further contends that she fabricated this story because of her relationship with Lane Schmidt.

See also Hutton v. State , 339 Md. 480, 663 A.2d 1289, 1300 (1995) :
Where the stressor cannot be objectively determined, its existence depends upon the credibility of the PTSD sufferer, and thus, expert testimony that the stressor alleged by the sufferer, in fact, caused the PTSD may be inappropriate for several reasons. First, since, in that event, the source will be the PTSD sufferer, to be able to identify a particular stressor as the precipitating cause of PTSD, as opposed to determining that it could be the precipitating cause, requires the expert to believe that the PTSD sufferer has experienced the traumatic experience related; he or she, in other words, must believe the PTSD sufferer. Second, because such a diagnosis implicates the credibility of the victim, allowing the expert to identify the traumatic event precipitating the PTSD runs a great risk in a jury trial that the jury's function will be usurped, i.e. the jury will give the expert opinion too great weight and not realize it is solely dependent on the veracity of the patient. See State v. Taylor , 663 S.W.2d [235,] 240 [ (Mo. 1984) ]. Finally, permitting an expert to determine whether a particular stressor is the causative factor in a particular case may require the expert to engage in credibility assessment, a matter outside his or her area of expertise and one historically and appropriately entrusted to the jury. In any event, it is certain that, no matter how learned in his or her field of expertise, no expert is in a better position to assess the credibility of a witness than is the jury.